[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wilks,* Slip Opinion No. 2018-Ohio-1562.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-1562

THE STATE OF OHIO, APPELLEE, *v.* WILKS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wilks,* Slip Opinion No. 2018-Ohio-1562.]

*Criminal law—Aggravated murder—Convictions and death sentence affirmed.*

(No. 2014-1035—Submitted January 24, 2018—Decided April 24, 2018.)

APPEAL from the Court of Common Pleas of Mahoning County, No. 13 CR 540.

_____

FRENCH, J.

{¶ 1} Appellant, Willie Wilks Jr., was convicted of the aggravated murder of Ororo Wilkins and the attempted murders of Alexander Morales Jr. and William Wilkins Jr. A jury recommended, and the trial court imposed, a sentence of death. In this appeal as of right, we affirm appellant's convictions and death sentence.

## I. TRIAL EVIDENCE

### A. Argument at appellant's home

{¶ 2} Evidence introduced at trial showed that around noon on May 21, 2013, Morales and William Wilkins (nicknamed "Mister") drove to the Youngstown home of Mary Aragon, Mister's mother, to borrow money from her.

But appellant, who was Aragon's boyfriend, had both of her bank cards, so the three of them went to appellant's nearby home to get the cards.

{¶ 3} Aragon knocked on the door and asked appellant for the cards; he agreed to give them to her but did not bring them outside. Mister then knocked on the door and asked appellant for the cards. Appellant told Mister that he would get them and asked Mister to come to the corner of the house.

{¶ 4} Appellant soon came outside and gave Mister one card but not the other. Appellant then asked Mister to walk to the back of the house with him. Mister observed appellant "fidgeting in his pants" as if he had a weapon. Mister became angry, they exchanged words, and Mister tried to start a fight.

{¶ 5} Appellant entered his house. He returned with a 9 mm handgun, chased Mister down the street, and pointed the gun at him. Mister did not believe that appellant would shoot him because people were around. Mister taunted appellant and called him names. When appellant saw Morales, appellant put the gun in his pocket. Morales introduced himself, and appellant said, "You better get your boy." Morales replied that they had come just to get the bank cards and did not want any trouble. Appellant handed the second bank card to Morales, and Morales, Mister, and Aragon left.

## B. Mister's phone call with appellant

{¶ 6} Later that afternoon, Mister, Morales, and two other individuals played basketball at a nearby playground. About 45 minutes after they started playing, Mister placed a phone call to Aragon. Mister asked his mother, "Why would you let [appellant] do that in front of [you]? Why would you be on his side?"

{¶ 7} Appellant got on the phone with Mister, and they had a heated discussion. Appellant told Mister that he was going to kill him. Appellant asked Mister where he was, but Mister refused to tell him. Mister called appellant a name and hung up.

### C. Murder of Ororo and attempted murders of Morales and Mister

{¶ 8} Later in the afternoon that same day, Mister and Morales drove to Mister's home, which was a short distance from Aragon's home. Mister was living with his girlfriend, Renea Jenkins, their three children, and Renea's mother.

{¶ 9} Upon arriving, Morales and Mister joined a gathering on the front porch. Soon thereafter, Mister went inside the house to his upstairs bedroom and Renea, her sister and brother, Shantwone and Antwone Jenkins, and Renea's two older children also went inside. Ororo Wilkins, Mister's sister, remained seated on the porch with Morales, who was holding Renea's five-month-old daughter.

{¶ 10} "[N]o more than ten minutes" after he and Mister arrived, Morales saw a "dark-color blue/purplish * * * Dodge Intrepid" near the house. Appellant exited the car, walked toward the porch, raised an "AK" rifle, and asked where Mister was. Morales turned with the baby to go inside the house. Appellant shot him in the back, and Morales dropped the baby and fell just inside the house. Appellant then shot Ororo in the head when she went to pick up the baby. Morales ran to the back of the house and collapsed in the kitchen.

{¶ 11} Mister witnessed the events from his upstairs bedroom. After hearing a car "skidding," he looked out the window and saw a car "like a purple Intrepid" parked in front of the house. Two people were in the front seats, and appellant was in the back. Appellant was wearing a hooded shirt with the hood up. Mister saw appellant walk toward the front porch carrying "some kind of rifle" and then saw appellant shooting toward the porch.

{¶ 12} Mister screamed, and appellant looked up and fired at him. Appellant's hood came off, and Mister made eye contact with him. Mister was not hit by the gunfire and went downstairs. But the car was gone when Mister got to the porch.

{¶ 13} Renea called 9-1-1. On the recording of the 9-1-1 call, Mister can be heard repeatedly yelling, "He killed my sister" and "I watched him kill my

sister." When police officers arrived at the scene, they found Mister holding Ororo's body in his arms, and Officer Jessica Shields heard him scream, "Willie did this. I don't know why Willie did this." Officer Melvin Johnson found Morales lying in the kitchen doorway. Morales told the officer that appellant did the shooting.

{¶ 14} Mister told Officer Shields that a black Dodge Stratus had squealed to a halt outside the house, causing him to look out the window. He told her that he then saw appellant jump out of the back seat with a big gun, which he thought was an AK-47.

{¶ 15} Investigators found a single 7.62 x 39 mm shell casing on the front porch. There was also a bullet strike near the front-door window and a bullet strike on the upper-story siding.

{¶ 16} Police broadcast a BOLO (be-on-the-lookout) request for appellant and for a dark-colored Intrepid and/or a silver minivan registered to his mother. They later learned that appellant purchased a 2004 purple Dodge Stratus four days before the shooting.

### D. Appellant's arrest

{¶ 17} On May 22, 2013—the day after the shooting—the police received a tip that appellant was driving a silver minivan. The minivan was spotted in Youngstown that afternoon. Appellant was driving the minivan and was the only person in the vehicle. The police followed appellant into a residential area, where he abandoned the vehicle and fled. He was apprehended after a short chase on foot.

{¶ 18} When the police searched appellant, they found a little over $2,000 in cash and one of Aragon's bank cards. They found a fully loaded 9 mm handgun in the van, and they recovered a 9 mm magazine near the van. Appellant's hands were swabbed for gunshot residue ("GSR") at the police station.

{¶ 19} Police never recovered appellant's purple Dodge Stratus. And although Mister later identified the other two occupants of the car in a police photo array, the police were unable to find them.

### E. Autopsy results

{¶ 20} Dr. Joseph Ohr, the Mahoning County medical examiner, conducted Ororo's autopsy. He testified that Ororo died from a gunshot wound to the head. The bullet entered the side of her head between her eye and ear and exited at the back of her head. The exit wound was "five, six centimeters" by "two and a half centimeters" in size. Dr. Ohr said that the damage to Ororo's head was "consistent with a very fast moving bullet, regardless of the caliber."

{¶ 21} Dr. Ohr also found a gunshot wound in the heel of Ororo's left hand. No soot was found that might have shown that the muzzle was near Ororo's hand when the gun was fired. Dr. Ohr said that it was possible that Ororo's hand was raised and that the same shot caused both wounds.

### F. Forensic evidence

{¶ 22} Martin Lewis, a forensic scientist in the trace-evidence section of the Ohio Bureau of Criminal Investigation ("BCI"), examined the GSR collected from appellant. He testified that "particles [were] highly indicative of gunshot primer residue * * * on both of the samples."

{¶ 23} Joshua Barr, a forensic scientist in the firearms section of BCI, examined the 7.62 x 39 mm cartridge. He testified that this cartridge is most commonly fired by an SKS (a semiautomatic carbine) or an AK-47 rifle. The police never recovered the murder weapon, however.

{¶ 24} Barr also examined two lead fragments found at the scene, but they were unsuitable for microscopic comparison. A lead fragment removed from Morales was also unsuitable for testing.

## II. CASE HISTORY

{¶ 25} Appellant was indicted on nine counts. Count 1 charged that appellant, purposely and with prior calculation and design, committed the aggravated murder of Ororo. Count 1 included a death-penalty specification for a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons, under R.C. 2929.04(A)(5).

{¶ 26} Count 2 charged appellant with the murder of Ororo, by improperly discharging a firearm into a habitation. Counts 3 and 4 charged appellant with the attempted murders of Morales and Mister, respectively. Counts 5 and 6 charged appellant with felonious assault. Count 7 charged him with discharging a firearm into an occupied structure. Counts 1 through 7 each included a firearm specification. Counts 8 and 9, charging appellant with having a weapon while under a disability, were severed from the other counts and later dismissed.

{¶ 27} Appellant pleaded not guilty to all the remaining charges. A jury found appellant guilty of all charges and specifications.

{¶ 28} Appellant was sentenced to death for the aggravated murder of Ororo. He was also sentenced to 11 years in prison for each attempted-murder count and 9 years for the firearm specifications, for a total of 31 years. The trial court ordered the prison sentences to run consecutively to the death sentence.

{¶ 29} Appellant now appeals his convictions and his death sentence, raising 19 propositions of law. We address some of appellant's propositions of law out of order.

### III. ANALYSIS

#### A. Failure to present exculpatory evidence to the grand jury

{¶ 30} In proposition of law No. III, appellant argues that his constitutional right to a fair grand-jury proceeding was violated because the state failed to present exculpatory evidence to the grand jury. Appellant argues that the state should have presented evidence that two witnesses said that the shooter was wearing dreadlocks

(testimony that appellant did not wear dreadlocks was presented at trial) and his video-recorded police statement denying all involvement in the case.

{¶ 31} In *United States v. Williams*, 504 U.S. 36, 51-52, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the Supreme Court of the United States held that a prosecutor has no duty to present exculpatory evidence to the grand jury. *Williams* states that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." *Id*. at 51. The court emphasized that "[i]t is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Id*.

{¶ 32} Appellant argues that authoritative sources support a requirement on the part of prosecutors to disclose exculpatory evidence to grand juries. He cites materials published by the United States Department of Justice and the American Bar Association ("ABA"). Section 9-11.233 of U.S. Department of Justice, *United States Attorneys' Manual* (1997) states:

> It is the *policy* of the Department of Justice * * * that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment * * *. While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.

(Emphasis added.) Until 2015, Standard 3-3.6(b) of American Bar Association, *ABA Standards for Criminal Justice: Prosecution Function* (3d Ed.1993) stated, "No prosecutor should knowingly fail to disclose to the grand jury evidence which

tends to negate guilt or mitigate the offense." But neither the Justice Department manual nor the ABA criminal-justice standards are binding on Ohio's grand-jury process, and any failure to follow them here did not violate appellant's constitutional rights. In any event, we do not view the allegedly exculpatory evidence as substantial.

**{¶ 33}** Alternatively, appellant attempts to rely on recommendations made by Ohio task forces established by this court. But none of the recommendations he cites have become law, and they have no impact here.

**{¶ 34}** We conclude that the prosecutor had no obligation, constitutional or otherwise, to present allegedly exculpatory evidence to the grand jury.

**{¶ 35}** We reject proposition of law No. III.

### B. Prosecutorial misconduct before the grand jury

**{¶ 36}** In proposition of law No. IV, appellant argues that his constitutional rights were violated because of prosecutorial misconduct allegedly committed during the grand-jury proceedings.

### 1. Legal principles

**{¶ 37}** We begin with the general principles that traditionally, the grand jury has had "wide latitude to inquire into violations of criminal law" and that the "technical procedural and evidentiary rules governing the conduct of criminal trials" do not restrain its operation. *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Additionally, a facially valid indictment is not subject to challenge based on grounds of inadequate or incompetent evidence. *Id.* at 345. A prosecutor may cast a wide net to find evidence to place before the grand jury. *Id*. at 344.

### 2. Analysis

**{¶ 38}** First, appellant asserts that the prosecutor improperly elicited hearsay. Detective Sergeant John Perdue testified before the grand jury that "everybody in the neighborhood was saying that that was Mary's boyfriend that

8

actually did the shooting." Perdue added, "So once we get on the scene, we talked to William and talked to Tonya and all of them, and they said it was Willie that actually came out and did the shooting." But it is well established that hearsay may be presented to a grand jury. *Costello v. United States*, 350 U.S. 359, 362-364, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

{¶ 39} Second, appellant complains that the prosecutor provided information about his prior criminal record. Detective Perdue testified before the grand jury that appellant was arrested in 1990 for "[m]urder, but they reduced it down to felonious assault." The prosecutor added, "Actually, he pled guilty to involuntary manslaughter and two counts of felonious assault, so back in 1990 he tried to kill at least a few people and killed one."

{¶ 40} R.C. 2939.10 states, "The prosecuting attorney or assistant prosecuting attorney may at all times appear before the grand jury to give information relative to a matter cognizable by it, or advice upon a legal matter when required." The prosecutor's role as the grand jury's legal advisor may also "give him leeway to make comments that would not be permitted of a trial attorney, who acts strictly as an advocate and leaves the giving of legal advice to the trial judge." 4 LaFave, Israel, King & Kerr, *Criminal Procedure*, Section 15.7(b), at 713-714 (4th Ed.2015).

{¶ 41} The prosecutor, in her role as legal advisor, ensured that the grand jury had correct information about the defendant's criminal record. Nevertheless, appellant claims that the prosecutor's statement that "in 1990 he tried to kill at least a few people and killed one" was misleading. But appellant fails to support that claim.

{¶ 42} Third, appellant argues that the prosecutor improperly became a witness during the grand-jury proceedings. A grand juror inquired about the health of the baby who was dropped during the shooting. Detective Perdue responded, "Yeah, the baby was fine." The prosecutor added that Ororo "was hit in the head"

and that she "dropped the baby." The prosecutor's remarks added some details to Perdue's testimony, but they were harmless.

{¶ 43} Fourth, appellant asserts that the prosecutor's discussion about a shell casing amounted to expert testimony. Detective Perdue testified before the grand jury that the casing was found on the porch and that witnesses had estimated that appellant was "a good ten, fifteen feet from the porch" when he started shooting. A grand juror asked whether the casing "flew that far"; Perdue answered that it had, and the prosecutor added, "They can fly that far." Perdue then testified that the police did not find other casings, stating that "it was just hard to say where they went." The prosecutor added, "That's the problem with casings. They fly, and a lot of times we can't find them and we know there's at least three shots fired." The prosecutor was repeating Perdue's testimony that casings can travel several feet. The prosecutor did not become an expert witness by simply clarifying Perdue's comments.

{¶ 44} Finally, appellant argues that the prosecutor misled the grand jury and may have lied when discussing the identities of the car's driver and other passenger. Detective Perdue testified that there were "three guys in the Intrepid. There was a driver and a passenger, and Wilks was in the back." The questioning continued:

> BY MS. DOHERTY [the prosecutor]:
>
> Q: But we don't know who these other people are at this point?
>
> A: No, we don't know who they are. We have an idea, but we're not really—
>
> Q: Now that we have him, maybe we'll get something. Okay?
>
> GRAND JUROR: Will they be chargeable?

MS. DOHERTY: Probably. Depending upon what their conduct was before and after. We just have to know who they are. Okay.

{¶ 45} Appellant claims that this colloquy falsely indicated that the prosecution and the police did not "know who these other people are." According to appellant, because Mister had identified the driver and passenger from a photo array on the night of the shootings, the prosecutor and the police knew who they were.

{¶ 46} Nothing shows that the prosecutor lied to or misled the grand jury. The prosecutor did not testify about the identities of the driver and other passenger. Moreover, the prosecutor did not attempt to mislead the grand jury by informing it that the driver and other passenger could "[p]robably" be charged once the police learned their identities and conduct.

{¶ 47} We reject proposition of law No. IV.

### C. Excusal of Spanish-speaking prospective juror

{¶ 48} In proposition of law No. VI, appellant argues that the trial court erred by excusing a Spanish-speaking prospective juror.

{¶ 49} On his questionnaire, prospective juror No. 481 stated that he was Hispanic. He added, "I don't speak well Inglish [sic]." Other answers on his questionnaire contained misspellings and poor grammar. He stated that he watched Univision and other Spanish-language television programs. He did not indicate where he was born but stated that he had lived in Illinois, Oklahoma, and Ohio over the past ten years.

{¶ 50} During voir dire, prospective juror No. 481 acknowledged that he did not speak English very well. He added, "I've been a waiter for so many years in different Mexican restaurants, but I just know about my work. And, you know, for things like this, it's kind of hard for me." He also stated that he did not

understand all the words on the questionnaire when he completed it. Following this short exchange, defense counsel stated, "We're okay, Judge." The trial court then excused this prospective juror.

{¶ 51} Under R.C. 2945.25(N), a person called for service as a juror in a criminal case may be challenged if "English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and law in the case." *Accord* Crim.R. 24(C)(13). The trial court has discretion to determine whether a prospective juror should be disqualified for cause, and we will not reverse unless the trial court has abused that discretion. *Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990).

{¶ 52} Here, defense counsel did not object to the trial court's excusal of prospective juror No. 481, so appellant has forfeited all but plain error. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 116. To prevail, appellant must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only if it affected the outcome of the trial); *see* Crim.R. 52(B). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 53} When examined individually, prospective juror No. 481 acknowledged that he did not speak English very well. Although he was not specifically asked, his questionnaire indicated that his native language was Spanish. He obtained his news and entertainment from Spanish-language television programs or other Spanish-language sources on the Internet. He said that he did not understand all the words on the questionnaire and that "for things like this, it's kind of hard for me." Under these circumstances, the trial court committed no plain error by excusing this prospective juror.

**{¶ 54}** Appellant cites *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649, 925 N.E.2d 584, in arguing that the trial court's excusal of prospective juror No. 481 violated the prospective juror's access to the courts and the opportunity to serve on juries.

**{¶ 55}** *Speer* involved a hearing-impaired prospective juror. During voir dire, the prospective juror informed the court that she could hear people's voices but could not understand spoken words without reading the speaker's lips. *Id*. at ¶ 11. The trial court denied a defense motion to excuse the prospective juror for cause. The court stated that it would accommodate her impairment by permitting her to sit where she could see the faces of the witnesses and by telling her to advise the court if she missed anything.

**{¶ 56}** As part of its case-in-chief, the state played a recording of a 9-1-1 call the defendant placed after the victim fell off a boat the defendant was navigating. The recording played an important role in each side's case: the prosecution argued that the defendant's tone and demeanor in the recording suggested that he had acted recklessly, while the defense cited the recording as evidence that the defendant was not under the influence of alcohol while operating the boat. *Id*. at ¶ 12-15. The defendant was convicted of aggravated vehicular homicide and involuntary manslaughter.

**{¶ 57}** The court of appeals reversed Speer's convictions, and we affirmed. We held that the trial court abused its discretion in denying the defense challenge for cause because the court's accommodation of allowing the hearing-impaired juror to read the transcript of the 9-1-1 recording was insufficient to enable the juror to perceive whether in the 9-1-1 recording there was urgency in the defendant's voice, whether his speech was slurred, and whether he sounded deceptive or hesitant. *Id*. at ¶ 28-29. We also articulated the test for determining whether an impaired juror may serve on a jury. *Id.* at ¶ 30.

**{¶ 58}** Citing *Speer*, appellant argues that the trial court should have more thoroughly questioned prospective juror No. 481 to determine whether an interpreter could have accommodated his lack of fluency. But unlike the hearing-impaired juror in *Speer*, there was a statutory basis for excusing prospective juror No. 481. The defense did not object to his excusal, and the trial court was not required to accommodate this prospective juror's language difficulty through an interpreter or some other means before excusing him.

**{¶ 59}** Finally, appellant argues that prospective juror No. 481 was denied his right to equal protection by being excused. "[A] defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race." *Powers v. Ohio*, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The trial court did not exclude prospective juror No. 481 because of his national origin or race. He was excluded because he lacked sufficient fluency in English. The record supports this basis for excusing the prospective juror. Accordingly, we reject appellant's equal-protection argument. *Compare State v. Smith*, 2d Dist. Montgomery No. 24402, 2013-Ohio-1586, ¶ 19, 28-29 (exclusion of an immigrant as a prospective juror, based on an erroneous finding that her knowledge of English was insufficient, violated the prospective juror's right to equal protection and constituted reversible error).

**{¶ 60}** We reject proposition of law No. VI.

### D. Courtroom closures

**{¶ 61}** In proposition of law No. V, appellant argues that courtroom closures during individual voir dire and the penalty-phase jury instructions violated his constitutional rights to a public trial.

*1. Individual voir dire*

**{¶ 62}** The trial court held individual voir dire inside the jury room over a several-day period. The parties discussed the procedure during a status hearing:

14

[THE COURT:] Lastly, when we began the case we did it with a one-on-one, extensive, detailed discussion and interview of each juror[]. *We did that in the open jury room which is adjacent to the courtroom * * * —the door was opened where anyone who wishes admitted was permitted.* That was done rather than in open court. At the direction and request of the defense of that long period of four weeks or so of the * * * individual voir dire regarding pretrial publicity as well as the death penalty aspect of the case, the defendant was not shackled, was in street clothes sitting at the table with prospective jurors and counsel was present, and *it was done at the behest of the defense*.

MR. YARWOOD [defense co-counsel]: I'll make the record very clear on this. First of all, our client was in civilian clothes during the entire proceedings. He was given, I think, tremendous latitude assisting us during it. *In fact, * * * we were back in the jury room that was open for people to come in and it was available*—and from our perspective that would meet the requirement of an open courtroom for purposes of people who wanted to come in and sit. There were chairs there for them to do it. It was available. Our position is that was of great benefit to be able to individually ask jurors in that form, and the Court and record should be very clear that we were satisfied with that. *Mr. Wilks was very satisfied with that means and manner.* I had even, in fact, told—when they were asking, where is other individuals? You're allowed to come in and sit down. It is open. So from our perspective we see it as a nonissue. * * *

MR. ZENA [lead defense counsel]: To reemphasize in some way what Ron [Yarwood] said, and this was discussed at length by

us. *Quite frankly, we asked that you proceed in that fashion in the hope that certain people wouldn't come and observe and thus expose this case to yet more publicity. We accomplished that fact by the manner in which it was conducted without barring anybody from the room.* That's all on us, and we asked you to do it that way.

(Emphasis added.)

**{¶ 63}** Shortly after this discussion, the trial court asked the defendant, "Mr. Wilks, anything from you?" He replied, "No, sir."

**{¶ 64}** The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee an accused the right to a public trial. *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *State v. Lane*, 60 Ohio St.2d 112, 119, 397 N.E.2d 1338 (1979), and fn. 2. This right extends to the voir dire of prospective jurors. *Presley v. Georgia*, 558 U.S. 209, 213, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010).

**{¶ 65}** Appellant argues that holding individual voir dire in the jury room constituted a de facto closure of the courtroom. He claims that the trial court kept spectators away from the proceedings. But nothing in the record indicates that spectators were excluded from attendance. The jury room was adjacent to the courtroom, the door would be opened for anyone who wished to be admitted, and there were empty chairs available. In short, there is little evidence in the record to show that a closure actually occurred. *See State v. Williams*, 9th Dist. Summit No. 26014, 2012-Ohio-5873, ¶ 10.

**{¶ 66}** But even if a closure had occurred, defense counsel *asked* the trial court to conduct individual voir dire in the jury room. The doctrine of invited error applies to appellant's claim. That doctrine specifies that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.*, 28 Ohio St.3d 20, 502

N.E.2d 590 (1986), paragraph one of the syllabus. And the doctrine applies to the erroneous closure of courtroom proceedings. *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 50-52 (defendant not entitled to complain about the closure of the courtroom during individual voir dire because he had specifically requested that the court conduct individually sequestered voir dire in chambers); *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 61-64 (defendant not entitled to complain about the closure of the courtroom during a suppression hearing when he had requested the closure to avoid prejudicial pretrial publicity). Here, appellant requested that individual voir dire be conducted in the jury room to limit pretrial publicity, and he may not complain of any error that he induced.

**{¶ 67}** Appellant also objects that he did not personally indicate consent to conducting individual voir dire in the jury room. He cites *State v. Hensley*, 75 Ohio St. 255, 266, 79 N.E. 462 (1906), in arguing that the right to a public trial "cannot be waived by the defendant's silence." But counsel may consent to a courtroom closure that is "primarily for the benefit of the defendant." *State v. Bayless*, 48 Ohio St.2d 73, 110, 357 N.E.2d 1035 (1976), *vacated on other grounds, sub nom. Bayless v. Ohio*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978). Here, defense counsel not only requested this procedure, but he also indicated that appellant "was very satisfied with that means and manner" of conducting individual voir dire.

**{¶ 68}** Accordingly, defense counsel could consent to conducting individual voir dire in the jury room without appellant's express consent. The jury room's location reduced defense exposure to pretrial publicity and benefited appellant. And as a tactical decision, it was well within defense counsel's purview. *See Commonwealth v. Lavoie*, 464 Mass. 83, 88-89, 981 N.E.2d 192 (2013) (counsel may waive, with or without the defendant's express consent, the right to a public trial during jury selection when the waiver is a tactical decision), citing

*Gonzalez v. United States*, 553 U.S. 242, 248, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008); 6 LaFave, Israel, King & Kerr, *Criminal Procedure*, Section 24.1(a), at 352.

### 2. Penalty-phase instructions

**{¶ 69}** Following penalty-phase closing arguments, the trial court addressed the jury and the spectators, stating:

> I'm going to give you your final closing instructions. It will take about a half hour. Those in the rear of the courtroom, you're certainly welcomed to stay; however, when I begin this instruction, it will take about a half hour and we're going to close the door and lock it, and it will remain closed for the duration. So if you don't want to stay for the duration, you should leave, so you're welcomed to do that now.

Defense counsel made no objection.

**{¶ 70}** Appellant argues that locking the courtroom doors violated his right to a public trial. Here, his failure to object at trial forfeited this claim absent plain error. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 103.

**{¶ 71}** Appellant contends that the trial court should have made findings in accordance with *Waller*, 467 U.S. at 45, 104 S.Ct. 2210, 81 L.Ed.2d 31, before locking the doors. In *Waller*, in reviewing a courtroom closure for a suppression hearing, the Supreme Court of the United States set out a four-pronged test that courts must use to determine whether closure of the courtroom is necessary: "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that

interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. at 48.

{¶ 72} Under the specific facts of this case, the trial court did not err under *Waller*. In *Waller*, the trial court excluded the public from the courtroom for the duration of a seven-day suppression hearing. *Id*. at 42. Here, the trial court announced to the spectators that they were welcome to stay but would not be permitted to leave during the 30-minute jury charge, presumably to avoid distracting the jury during the instructions. *See United States v. Scott*, 564 F.3d 34, 37-38 (1st Cir.2009) (distinguishing *Waller* and determining that closure did not occur when trial court locked the courtroom during instructions but allowed spectators to remain). The public was merely prevented from entering and leaving the courtroom during this brief period.

{¶ 73} There is no evidence that anyone was denied access to the courtroom during the penalty-phase instructions. Given these facts, we conclude that no plain error occurred. *See United States v. Dugalic*, 489 Fed.Appx. 10, 19 (6th Cir.2012) (right to public trial not violated when spectators prevented from entering and leaving the courtroom during closing arguments); *State v. Brown*, 815 N.W.2d 609, 617-618 (Minn.2012) (right to public trial not violated when the courtroom doors were locked during jury instructions but spectators could remain).

{¶ 74} Nevertheless, we caution that while a trial court has discretion to control the proceedings, it must exercise that discretion carefully and sparingly in these circumstances. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 51. As we recognized in *Drummond*, "The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice." *Id.* But a trial court may abridge a defendant's right to a public trial "only when necessary, and any closure must be narrowly drawn and applied sparingly." *Id.* In keeping with these principles, a trial

court should leave the courtroom open and the doors unlocked during all proceedings unless the court makes findings adequate to support the closure.

{¶ 75} Because appellant waived all but plain error here and we have found none, we reject proposition of law No. V.

### E. Victim-impact and emotionally laden testimony

{¶ 76} In proposition of law No. VII, appellant argues that the trial court erred in admitting victim-impact and other emotionally laden testimony.

{¶ 77} Defense counsel filed a pretrial motion in limine to exclude victim-impact testimony. But except when noted below, appellant did not renew his objection at trial and therefore has forfeited all but plain error. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 130.

{¶ 78} First, appellant argues that Traniece Wilkins, Ororo's older sister, presented victim-impact testimony during her direct examination. Traniece testified:

> Well, [Ororo] had a beautiful heart, and she was smart, caring, funny. She loved to make people laugh. And whenever she was anywhere, like she commanded attention. When she was present, you knew she was in the room. It's just like she just had this personality where like people just gravitated to her * * *.

Traniece also said that Ororo thought that her nieces and nephews were "the best thing since sliced bread." Traniece added that her brothers and sisters had a close relationship and that she was involved in raising Ororo.

{¶ 79} Victim-impact testimony does not violate constitutional guarantees. *See Payne v. Tennessee*, 501 U.S. 808, 825-827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). We have permitted victim-impact testimony in limited situations in capital cases when the testimony is not overly emotional or directed to the penalty to be

imposed. *Powell* at ¶ 134; *State v. Hartman*, 93 Ohio St.3d 274, 293, 754 N.E.2d 1150 (2001).

**{¶ 80}** Traniece's brief testimony was not overly emotional. She did not mention the effect that Ororo's death had on their families. She neither mentioned nor recommended a possible sentence. No plain error occurred.

**{¶ 81}** Second, citing Evid.R. 401 and 403, appellant argues that the trial court should have excluded Officer Shields's emotionally laden testimony and her description of the bloody crime scene.

**{¶ 82}** Evidence is relevant, and therefore generally admissible under Evid.R. 402, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. But a court must exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A).

**{¶ 83}** Officer Shields described the crime scene as "the most gruesome scene I have ever seen up until that date and since then." She testified: "[Mister] was wearing white shorts that were covered in blood, completely saturated in blood and brain matter. He was holding on to his sister's head like so, like this. Brains were all over the place. He was trying to hold the sides of her head." After describing the scene, Shields testified that Mister screamed, "Willie did this. I don't know why Willie did this."

**{¶ 84}** Defense counsel, at the completion of Officer Shields's testimony, objected to her "blurting out" that this was the "most gruesome scene" she had ever seen. At the defense's request, the trial court gave the jury a curative instruction, stating:

> It's an emotional situation; and, obviously, for young police officers,
> it's not unnatural to have feelings about things as you see them.

> \* \* \* So I am admonishing you, as I did early on in my instruction, that emotion and feeling and bias and attitude towards or against a witness or a judge or the parties \* \* \* has no place in the courtroom. \* \* \* I just want you to understand what she said regarding that is not evidence regarding this case. That may be a feeling she has, but that does not in any way bear evidence upon the facts that we are here to determine.

{¶ 85} Officer Shields's testimony that this was the "most gruesome scene" she had witnessed was irrelevant. But these were brief remarks. Defense counsel failed to make a contemporaneous objection to her testimony, and appellant cannot show that these comments resulted in plain error. *See State v. Murphy*, 91 Ohio St.3d 516, 532, 747 N.E.2d 765 (2001) (party must make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review). To the extent that Officer Shields's comments about the "gruesome scene" were improper, the trial court's instructions cured them. *See State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001) (we presume that a jury follows a court's curative instructions, including instructions to disregard testimony).

{¶ 86} Nevertheless, appellant argues that the prosecutor's closing argument erased the effect of the curative instructions. The prosecutor argued:

> You got a curative instruction after [Officer Shields] testified. But what I want to tell you is, she's human. \* \* \* Just because she had some emotion you don't have to consider that, and we ask you not to consider that. We—actually the Judge instructed you not to consider her emotion. But that's the reality. This is not a sterile situation where police officers go out and they see random people \* \* \* who they aren't affected by. So understand that when she was

> testifying and getting somewhat animated, she was reliving that also. She was reliving what she saw.

Defense counsel did not object.

{¶ 87} Here, the prosecutor was arguing that Officer Shields was a credible witness despite her emotional reaction regarding the crime scene. *See State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970) (prosecutor entitled to "wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom"). The trial court also had instructed the jury that closing arguments are not evidence and are "not to be considered by you as such." We reject appellant's claim that the prosecutor's argument erased the effect of the earlier curative instructions.

{¶ 88} Appellant also specifically takes issue with Officer Shields's testimony about Mister holding Ororo's head and his shorts being "saturated in blood and brain matter." But the court properly admitted this testimony because it established the condition of Ororo's body at the scene. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 92-93; *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 222 (police testimony identifying "brain matter" at the crime scene properly admitted). It also depicted Mister's distress, which was relevant in showing the plausibility of Mister's excited utterance that appellant was the killer.

{¶ 89} Finally, appellant argues that Dr. Ohr, the medical examiner, gave inflammatory testimony regarding the gunshot fired at Ororo. Ohr testified that the lack of soot or stippling showed that the weapon was fired at "an indeterminate range" beyond three to four feet. Defense counsel then asked, "And had the firearm been fired at that close a range * * * where soot and stippling may have been left, what would be the difference in the damage to Ororo Wilkins' head?" Ohr replied, "Well, Counselor, frankly, the gunshot wound would have * * * taken her head."

He also testified that "the damage done here is consistent with" a high-powered or high-velocity projectile.

**{¶ 90}** The medical examiner's duties include examining the victim and the crime scene and determining the manner and cause of death. *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 70. A medical examiner is "an expert witness who is permitted to give an opinion on matters within his scope of expertise." *State v. Heinish*, 50 Ohio St.3d 231, 234, 553 N.E.2d 1026 (1990).

**{¶ 91}** Dr. Ohr's testimony was well within the scope of his expertise. Moreover, Ohr's testimony refuted the defense's theory that the murder weapon was a handgun. That evidence was relevant in showing that Ororo's wounds were consistent with a shot fired from a high-powered or high-velocity rifle. No plain error occurred, and we reject proposition of law No. VII.

### F. Admissibility of handgun evidence

**{¶ 92}** In proposition of law No. VIII, appellant argues that prejudicial error occurred when the state introduced evidence of a handgun not used during the murder and attempted murders. Appellant did not object to the introduction of this evidence at trial and therefore has forfeited all but plain error. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 15.

### *1. Relevant facts*

**{¶ 93}** On the day of the shootings, during the argument over Aragon's bank cards, appellant pointed a 9 mm handgun at Mister and chased him. Later that afternoon, appellant killed Ororo and shot Morales in the back with a rifle. The next day, the police found a loaded 9 mm handgun in the van appellant was found driving.

**{¶ 94}** Morales testified that appellant used an "AK" rifle in the shootings. During cross-examination of Officer Robert Martini, defense counsel elicited that Morales told him before going into surgery that appellant had used a handgun. At trial, Morales denied saying that to Martini.

*2. Analysis*

{¶ 95} The admission of the evidence regarding the 9 mm handgun rested upon its relevance. Evid.R. 401, 402. Appellant's use of the handgun was part of the chain of events leading from the initial confrontation outside appellant's home to the murder and attempted murders at Mister's house. The defense opened the door for the introduction of the handgun evidence when it presented testimony that Morales had told a police officer that he saw appellant open fire with a handgun. The handgun evidence was relevant and admissible.

{¶ 96} Appellant cites two cases in arguing that the handgun evidence was inadmissible because it was not used in the murder and attempted murders. In *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, the trial court, over defense objection, admitted 19 firearms found in the defendant's basement, *id.* at ¶ 102-103. We concluded that the trial court erred in admitting that evidence because the weapon used to kill the victim had been "unmistakably identified and admitted into evidence" and these other weapons had no relevance in proving the charges. *Id.* at ¶ 106.

{¶ 97} In *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, the trial court permitted testimony about weapons and ammunition found in the defendant's storage unit and motel room. The prosecution also presented to the jury photographs of the weapons. *Id.* at ¶ 154-155. We held that the trial court erred in admitting this evidence because the murder weapon had been identified and admitted into evidence and these other weapons and ammunition "had no connection with the murders." *Id.* at ¶ 156-157.

{¶ 98} Unlike *Trimble* and *Neyland*, in this case, appellant's use of the handgun was part of the chain of events leading to the murder and attempted murders and was relevant in proving motive and intent. Appellant's reliance on *Trimble* and *Neyland* lacks merit.

{¶ 99} We reject proposition of law No. VIII.

## G. Shackling

{¶ 100} In proposition of law No. XII, appellant argues that the trial court erred when it ordered appellant to be shackled without holding a hearing.

{¶ 101} No one should be tried while shackled, absent unusual circumstances. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 219, citing *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. But it is widely accepted that a prisoner may be shackled when there is a danger of violence or escape. *Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 82. The decision to require restraints is left to the sound discretion of the trial court, which is in a position to consider the defendant's actions both inside and outside the courtroom as well as his demeanor while the court is in session. *Id.*

### 1. Rulings on restraints

{¶ 102} Upon announcement of the trial-phase verdict, appellant reacted by stating: "I didn't do this." Upon exiting the courtroom, appellant kicked a large hole in the plaster wall adjacent to the courtroom and had to be subdued.

{¶ 103} The trial court discussed the matter in an out-of-court hearing, stating: "I'm not so concerned about his conduct, because he's been exemplary throughout the trial and conducted himself appropriately, and upon consultation with his lawyers I think they were able to explain to him that that can't occur." But the court continued:

> [B]ecause of the safety of my courtroom and the people in it, and
> not necessarily the conduct of the defendant, I think that could act
> as a fuse to ignite other types of outbursts and, therefore, create an
> unstable circumstance in my courtroom, I have determined that what

I'm going to do is I'm going to permit the defendant to appear in street civilian clothes, but we are going to have him restrained * * *.

The trial court said that appellant's restraints would be concealed under his clothing. The court's judgment entry stated that the Mahoning County Courthouse Security Detail would determine the "proper restraints."

{¶ 104} Defense counsel objected that the fact that appellant had had "a little bit of an outburst in the courtroom in which he maintained his innocence" did not justify the use of restraints. Defense counsel noted that appellant was placed in "belly handcuffed locks" that were worn underneath his suit.

{¶ 105} During the penalty phase, appellant made an unsworn statement. Beforehand, the trial court stated that appellant's "handcuffs [would] be removed for him to deliver a presentation to the jury." The court added that after his unsworn statement, "the jury [would] be excused, and then the Defendant [would] be rehandcuffed and secured again."

### 2. Analysis

{¶ 106} Appellant argues that the trial court's order placing him in restraints was an overreaction that his limited outburst did not justify. But the trial court observed appellant's disruptive behavior and expressed concern about the potential for future outbursts. A "court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures." *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 79.

{¶ 107} The trial court took steps to ensure that the jury would not see appellant in restraints, by ordering that they be worn under his civilian clothing. Nothing in the record shows that the jury saw appellant wearing restraints while he was sitting at counsel's table or when making his unsworn statement. Under these

circumstances, appellant fails to show that the trial court abused its discretion in ordering that he be placed in restraints.

{¶ 108} Appellant argues that the trial court should have conducted an evidentiary hearing before ordering that he be placed in restraints. But a hearing on the necessity for restraints was not required. *See Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 94; *Franklin* at ¶ 82. And in any event, the record shows that the trial court made a factual determination supporting the use of restraints.

{¶ 109} Appellant asserts that the trial court erred by leaving the selection of the proper restraints to the courtroom-security detail. We addressed a similar claim in *Neyland*. In that case, we held that the trial court erred by leaving the final decision on wearing a second restraint to the "discretion of the sheriff's department." *Neyland* at ¶ 99 and 101. But that did not happen in this case. Here, the trial court decided that appellant would wear restraints that would be concealed underneath his clothing. The security detail determined only the "proper restraints" to carry out that order. The trial court did not relinquish its responsibility to make the decision on shackling to the discretion of the security detail. *See State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 104 (the trial court must exercise its own discretion and not leave the issue of shackling up to security personnel).

{¶ 110} Finally, appellant alleges that the handcuffs attached to the belly device inhibited his communications with counsel. But nothing in the record supports this allegation, and neither appellant nor defense counsel complained at trial that they were unable to communicate. He also argues that the jury would have noticed a difference between appellant's communications with counsel during the trial phase versus his communications with them during the penalty phase. This claim is entirely speculative, and nothing in the record supports it.

{¶ 111} We reject proposition of law No. XII.

**H. Transferred intent**

{¶ 112} In proposition of law No. X, appellant argues that the trial court improperly instructed the jury on transferred intent with respect to the course-of-conduct aggravating circumstance. *See* R.C. 2929.04(A)(5) ("the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender").

{¶ 113} "The doctrine of transferred intent is firmly rooted in Ohio law." *State v. Sowell*, 39 Ohio St.3d 322, 332, 530 N.E.2d 1294 (1988). " 'If one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A).' " *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 171, quoting *State v. Solomon*, 66 Ohio St.2d 214, 421 N.E.2d 139 (1981), paragraph one of the syllabus.

{¶ 114} Over defense objection, the trial court instructed the jury on "transfer of purpose," stating:

> Transfer of purpose. Purpose to cause the death: If you find that the defendant did have a purpose to cause the death of a * * * particular person, and the shot accidentally caused the death of another, then the defendant would be just as guilty as if the shot had taken effect upon the person intended.
>
> The purpose required is to cause the death of another, not any specific person. If the shot missed the person intended but caused the death of another, the element of purpose remains and the offense is as complete as though the person for whom the shot was intended had died.

**{¶ 115}** Appellant argues that this instruction permitted the jury to convict him of the R.C. 2929.04(A)(5) specification even if the jury believed that he had a purpose to kill only one person (i.e., Mister). "In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

**{¶ 116}** Even disregarding the doctrine of transferred intent, the jury had overwhelming evidence that appellant had a purpose to kill Ororo. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978).

**{¶ 117}** Here, appellant shot Morales in the back and Ororo in the head with a high-powered rifle, both at close range. He then fired at Mister in his upstairs bedroom. While appellant's initial motive may have been to kill only Mister, the evidence showed that he purposely killed Ororo and attempted to kill both Morales and Mister. *See Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 143.

**{¶ 118}** Nevertheless, appellant argues that the instructions misled the jury and resulted in prejudicial error. But nothing in the instructions shows that to be the case. The trial court instructed the jurors that if they found that the state had failed to prove beyond a reasonable doubt any part of the course-of-conduct specification, they must find appellant not guilty of the specification. *See id.*

**{¶ 119}** We reject proposition of law No. X.

## I. Aggravated-murder instructions

{¶ 120} In proposition of law No. IX, appellant argues that the trial court improperly instructed the jury on aggravated murder. He also argues that defense counsel provided ineffective assistance by failing to object to the instructions.

### 1. Relevant background

{¶ 121} Following closing arguments, the trial court instructed the jury:

Lesser included offense: *If you find that the state failed to prove beyond a reasonable doubt all the essential elements of aggravated murder as defined in Count 1, then your verdict must be not guilty of that offense.* And in that event you will continue your deliberations to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of murder.

If all of you are unable to agree on a verdict of either guilty or not guilty of the offense of aggravated murder in Count 1, then you will continue your deliberations to decide whether the state has proven beyond a reasonable doubt all the essential elements of the lesser included offense of murder.

(Emphasis added.) By not objecting to these instructions, appellant has forfeited all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus.

### 2. Analysis

#### a. No plain error

{¶ 122} The state must prove each element of an offense beyond a reasonable doubt. *State v. Jones*, 91 Ohio St.3d 335, 347, 744 N.E.2d 1163 (2001). Appellant argues that the above-quoted instructions relieved the state of its burden.

That is, the trial court instructed the jury that if the state failed to prove *all of the elements* of the aggravated-murder charge, then it must find the defendant not guilty. He asserts that the instructions should have used the word "any" instead of "all" to articulate correctly the state's burden of proof as to the elements of the offense.

{¶ 123} Jury instructions must "correctly and completely state the law." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 32. In assessing jury instructions, a reviewing court must decide not only whether the instruction at issue is correct in the abstract but also whether it is potentially misleading. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 52. If an instruction is ambiguous, a reviewing court must determine " 'whether there is a reasonable likelihood that the jury has applied [it] in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). And when examining instructions, an appellate court should not judge a single instruction in artificial isolation but instead should view it in the context of the overall charge. *State v. Madrigal*, 87 Ohio St.3d 378, 396, 721 N.E.2d 52 (2000).

{¶ 124} Appellant cites *Miller v. State*, 298 Kan. 921, 318 P.3d 155 (2014), in arguing that the aggravated-murder instructions were erroneous. In *Miller*, the trial court instructed the jury, " 'If you have a reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you must find the defendant not guilty.' " (Emphasis added.) *Id*. at 923. Because the instruction used "each of the claims" instead of "any of the claims," the court held that the instruction "effectively told the jury it could acquit Miller only if it had a reasonable doubt as to all of the elements the State was required to prove—rather than acquitting him if it had a reasonable doubt as to any single element." *Id*. The court held that the error was structural and remanded the case for a new trial. *Id.* at 923, 940.

**{¶ 125}** Appellant contends that the instructions in his case were similarly deficient. Arguably, they could be interpreted to mean that the jury should acquit appellant "only if it had a reasonable doubt as to all of the elements the State was required to prove." *Id*. at 923. If interpreted this way, the instructions in isolation left a misleading gap because they did not clearly state that the jury must find appellant not guilty if the state failed to prove any of the elements beyond a reasonable doubt. But the jurors were unlikely to have been misled because the trial court's earlier instructions correctly articulated the state's burden of proof as to each of the elements.

**{¶ 126}** In preceding instructions, the trial court had advised the jurors, "The defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged in the indictment." The trial court then instructed the jury as to Count 1, "Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about May 21st, 2013, in Mahoning County, Ohio, the defendant purposely, and with prior calculation and design, caused the death of Ororo Wilkins."

**{¶ 127}** The court also advised the jury as to the accompanying aggravating circumstance, stating: "If you find that the state proved beyond a reasonable doubt all of the essential elements of the Specification 1 to Count 1, your verdict must be guilty. *If you find the state failed to prove beyond a reasonable doubt any of the essential elements of Specification 1 to Count 1, your verdict must be not guilty*." (Emphasis added.) The trial court provided a similar instruction as to Specification 2 of Count 1, the accompanying firearm specification, stating: "*If you find that the state failed to prove beyond a reasonable doubt any of the essential elements of Specification 2 to Count 1, your verdict must be not guilty*." (Emphasis added.)

**{¶ 128}** These additional unambiguous instructions distinguish this case from *Miller*, in which "the only instruction defining for the jury the State's burden

of proof was the instruction that was wrong." 298 Kan. at 934, 318 P.3d 155. Here, the trial court instructed the jurors that they must acquit appellant "unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged." These clear instructions remove any uncertainty that the jury found proof beyond a reasonable doubt as to each of the essential elements of the aggravated-murder charge. Moreover, when the challenged instructions are considered as a whole and viewed in the context of earlier instructions, they were not prejudicially misleading.

**{¶ 129}** Appellant also challenges the trial court's instructions on the lesser included offense of murder. These instructions were consistent with the standard jury instructions for lesser included offenses at the time of appellant's trial. *See Ohio Jury Instructions*, CR Section 425.09 (2014).[1] Similar instructions have been upheld. *See, e.g.*, *State v. Ware*, 9th Dist. Summit No. 28088, 2017-Ohio-2643, ¶ 3, 6-8; *State v. Evans*, 8th Dist. Cuyahoga No. 79895, 2005-Ohio-5683, ¶ 28-30 (instructions, considered as a totality, did not require acquittal on a greater crime before jury could consider a lesser included offense).

**{¶ 130}** Based on the foregoing, we find no plain error in the challenged instructions. *See* Crim.R. 52(B); *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *see also State v. Campbell*, 69 Ohio St.3d 38, 48-49, 630 N.E.2d 339 (1994) (allegedly improper instruction on criminal purpose and allegedly confusing instruction as to causation and foreseeability did not result in plain error).

---

[1] Effective May 2, 2015, section 425.09 replaced "all" with "any."

b. Structural-error analysis does not apply

**{¶ 131}** Appellant argues that we should treat as structural error any failure by the trial court to properly instruct on the state's burden of proof as to each of the elements of the offense.

**{¶ 132}** A structural error is one that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural errors "permeate '[t]he entire conduct of the trial from beginning to end.' " *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17, quoting *Fulminante* at 309. Most constitutional errors are not structural. *Fulminante* at 306-307. An error is structural only when it "*necessarily* render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (Emphasis sic.) *Neder v. United States*, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

**{¶ 133}** The Supreme Court of the United States has found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases. *See, e.g.*, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (race discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction to jury).

**{¶ 134}** Appellant relies on *Miller*, 298 Kan. at 938, 318 P.3d 155, which in turn relies on *Sullivan*, in arguing that the error was structural. But we do not agree that *Sullivan* forecloses plain-error analysis in this case.

{¶ 135} The error in *Sullivan* was structural because the trial court in that case had defined "reasonable doubt" to mean "grave uncertainty," a definition the Supreme Court already had held to be unconstitutional. *Id*. at 277; *see Cage v. Louisiana*, 498 U.S. 39, 40, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The court held that although most constitutional errors are amenable to harmless-error analysis, the harmless-error doctrine cannot apply when the burden of proof has been misdefined. *Id*. at 279-281. The court reasoned that a jury cannot render a guilty-beyond-a-reasonable-doubt verdict when "reasonable doubt" itself has been misdefined. *Sullivan* at 280. There was "no jury verdict within the meaning of the Sixth Amendment" that harmless-error analysis could salvage. *Id*.

{¶ 136} In *Neder*, 527 U.S. at 4, 119 S.Ct. 1827, 144 L.Ed.2d 35, the Supreme Court reviewed a case in which the trial court had erred in refusing to submit the issue of materiality to the jury with respect to charges involving tax fraud. The court held that the harmless-error rule applied. The *Neder* court compared the error before it to the error in *Sullivan*. It explained that the *Sullivan* court "concluded that the error was not subject to harmless-error analysis because it 'vitiates *all* the jury's findings,' * * * and produces 'consequences that are necessarily unquantifiable and indeterminate.' * * * By contrast, the jury-instruction here did not 'vitiat[e] *all* the jury's findings.' " (Emphasis sic.) *Id*. at 11, quoting *Sullivan*, 508 U.S. at 281-282, 113 S.Ct. 2078, 124 L.Ed.2d 182.

{¶ 137} In *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 17, we held that structural error did not occur when the trial court had failed to instruct on the culpable mental state of the offense of trespass and on all the elements of the offense of assault: "[T]he instructions in this case did not necessarily render the trial so fundamentally unfair that it could not be a reliable vehicle for the determination of the defendant's guilt or innocence," *id*. at ¶ 24. Accordingly, we held that the instructional errors were subject to a plain-error analysis. *Id*. at ¶ 25.

{¶ 138} The nature of the error here is also different from that in *Sullivan*. The instructions here did not misrepresent "reasonable doubt," and the failure to present more precise instructions did not vitiate *all* the jury's findings. We conclude that the present case is more analogous to improperly instructing the jury on an element of an offense as in *Wamsley* than to failing to give a proper reasonable-doubt instruction altogether.

{¶ 139} The instructional error here was mere trial error and amenable to plain-error review under Crim.R. 52(B). No plain error occurred.

### c. No ineffective assistance of counsel

{¶ 140} As a final matter, appellant argues that his trial counsel provided ineffective assistance by failing to object to the instructions. To establish ineffective assistance, appellant must (1) show that counsel's performance "fell below an objective standard of reasonableness" as determined by "prevailing professional norms" and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 141} As we discussed above, the trial court gave other unambiguous instructions that correctly articulated the state's burden of proof as to each of the elements of aggravated murder. Defense counsel could reasonably have thought that these instructions were sufficient to protect their client. *See Campbell*, 69 Ohio St.3d at 49, 630 N.E.2d 339.

{¶ 142} We reject proposition of law No. IX.

### J. Instructing on lesser included offenses

{¶ 143} In proposition of law No. XI, appellant argues that the trial court erred in instructing on lesser included offenses of aggravated murder. He also argues that he cannot be guilty of both (1) the attempted aggravated murders of Mister and Morales and (2) the felonious assaults of Mister and Morales. *See*

*Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 28. However, appellant did not raise these claims at trial and therefore has forfeited all but plain error.

### 1. Relevant background

{¶ 144} For Count 1, the trial court instructed the jury as to the offense of the aggravated murder of Ororo with prior calculation and design. As to Count 1, the court also instructed on the lesser included offense of murder. For Count 2, the court instructed the jury on the murder of Ororo by improperly discharging a firearm into a habitation. The jury found appellant guilty of all three offenses.

{¶ 145} The trial court merged Count 2 with Count 1 for sentencing purposes. But the trial court did not mention merger of the findings of guilt as to the lesser included offense of murder under Count 1. The trial court also merged Count 5 (the felonious assault of Morales) with Count 3 (the attempted murder of Morales) and merged Count 6 (the felonious assault of Mister) with Count 4 (the attempted murder of Mister).

### 2. Analysis

{¶ 146} Appellant argues that the trial court erred in instructing on the lesser included offense of murder because the shooter's identity was the only issue that the jury had to decide. Appellant contends that if the jury decided beyond a reasonable doubt that he was the shooter, then it had no choice but to return a verdict of guilty as to aggravated murder.

{¶ 147} Appellant cites *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, in arguing that "a charge on a lesser included offense is * * * improper when the facts do not warrant it," *id.* at ¶ 20. But *Wine* does not support appellant's claim.

{¶ 148} In *Wine*, as in the present case, the defendant presented an "all or nothing" defense. *Id.* at ¶ 1. Wine was charged with rape. The defendant testified at trial that he was never in the room where the victim said she was raped. The trial

court, over defense objection, instructed the jury on rape and the lesser included offenses of sexual battery and gross sexual imposition. *Id*. at ¶ 7. The jury found Wine not guilty of rape and sexual battery but guilty of gross sexual imposition.

{¶ 149} We upheld the instructions on the lesser included offenses, and we rejected Wine's claim that the defendant has the right to control whether a jury receives instructions on them. We held:

> A defendant's choice to pursue an all-or-nothing defense does not require a trial judge to impose upon the state an all-or-nothing prosecution of the crime charged if the evidence would support a conviction on a lesser included offense: "If under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense, the instruction on the lesser included offense must be given."

*Id*. at ¶ 32, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303 (1980).

{¶ 150} The state argues that the trial court's instruction on the lesser included offense of murder was proper because the jury might have found that appellant did not murder Ororo with prior calculation and design, one of the essential elements of the offense of aggravated murder in Count 1. We agree.

{¶ 151} The evidence introduced at trial showed that appellant went to Mister's house to kill Mister following their argument outside appellant's home. But appellant killed Ororo when he arrived at Mister's home. Under these circumstances, the jury might have reasonably determined that appellant killed Ororo after momentary consideration rather than with prior calculation and design. *See State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18.

The trial court committed no plain error in instructing the jury as to the lesser included offense of murder.

**{¶ 152}** We note that the trial court failed to merge the lesser included offense of murder as to Count 1 with aggravated murder as to Count 1 before sentencing. Although merger should have taken place, resentencing is not automatically required. *See State v. Fears*, 86 Ohio St.3d 329, 344, 715 N.E.2d 136 (1999). Appellant was not separately sentenced for this lesser included offense. *See State v. Bonnell*, 61 Ohio St.3d 179, 183, 573 N.E.2d 1082 (1991) (sentencing on two counts of aggravated murder was merely a procedural error that was corrected by declaring the two offenses merged). Moreover, the outcome of the mitigation hearing was not affected because the jury did not consider duplicative aggravating circumstances. Accordingly, we correct this error by holding that the lesser included offense of murder as to Count 1 merged with aggravated murder as to Count 1.

**{¶ 153}** Appellant separately claims that he could not be found guilty of both attempted aggravated murder and felonious assault. The trial court merged the felonious-assault counts with the attempted-murder counts, and appellant was sentenced once for the offenses involving Morales and once for the offenses involving Mister. However, "the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, paragraph three of the syllabus. We also reject this claim.

**{¶ 154}** We reject proposition of law No. XI.

### K. Sufficiency and manifest weight of the evidence

**{¶ 155}** In propositions of law Nos. I and II, appellant challenges the sufficiency and manifest weight, respectively, of the evidence supporting his convictions.

40

*1. Sufficiency of the evidence*

{¶ 156} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 157} Appellant's sufficiency claim lacks merit. Eyewitness testimony, forensic evidence, circumstantial evidence, and appellant's attempt to elude police sufficiently established appellant's guilt. The evidence presented at trial showed that on May 21, 2013, appellant and Mister had a confrontation over bank cards belonging to Mister's mother and that appellant then chased Mister down the street with a 9 mm handgun. Later, they had a heated discussion on the phone and appellant told Mister that he was going to kill him. Shortly thereafter, appellant and two other individuals drove to Mister's home. Morales testified that appellant approached the front porch and shot Morales in the back with an "AK" rifle. Appellant then shot and killed Ororo. Mister looked out an upstairs window and saw appellant firing toward the porch. Appellant then shot at Mister before departing the scene. The police arrested appellant the next day while he was fleeing.

{¶ 158} Appellant provides a list of reasons why the evidence was insufficient to establish his guilt. He argues that there was a lack of reliable forensic or other scientific evidence linking him to the crimes. He asserts that no ballistic evidence established that the victims were shot with a rifle. But appellant's argument overlooks the evidence that the 7.62 x 39 mm shell casing found on the porch would have been fired from a rifle rather than a handgun. And Orono's injuries were consistent with having been shot with a high-velocity bullet.

**{¶ 159}** Appellant also argues that only one shell casing was found at the scene, demonstrating that only one shot was fired. However, there was a bullet strike on the upper-story siding near where Mister was standing when appellant shot at him, and an indentation near the front-door window could have been another bullet strike. And even though bullet fragments were not recovered from the siding, nothing suggests that this bullet strike was unrelated to the shootings. The witnesses also testified that multiple shots were fired.

**{¶ 160}** Expert testimony established that police found GSR on appellant's hands after he was arrested. Appellant argues that he may have had GSR on his hands from handling the 9 mm handgun found in the van and, alternatively, that the arresting officers could have transferred the GSR to his hands because the officers had been at the firing range earlier that day. However, questions about the significance of the GSR results went to the weight of the evidence and not its sufficiency. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 226.

**{¶ 161}** Appellant also argues that the evidence is insufficient to convict him because two people identified the shooter as wearing dreadlocks. Officer Melvin Johnson testified during cross-examination that more than one person told him that the shooter had dreadlocks. And Detective Sergeant Perdue testified that Shantwone Jenkins told him that the shooter had dreadlocks. But this argument calls for an evaluation of the credibility of the testimony, analysis that is not proper on review of evidentiary sufficiency. *See Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 200.

**{¶ 162}** Appellant also questions Morales's and Mister's credibility. But witness credibility is not a proper matter on review of the sufficiency of the evidence. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 169.

**{¶ 163}** Appellant also argues that he had no motive to shoot Ororo. He suggests that someone else may have had a reason to shoot Ororo because testimony showed that she was "beefing with people" and her purse contained a BB gun along with credit cards and driver's licenses belonging to other people. But no other evidence supports this speculative assertion. *See State v. Stoudemire*, 118 Ohio App.3d 752, 762, 694 N.E.2d 86 (8th Dist.1997) (assessing motive is particularly within the province of the jury, and a reviewing court will not substitute its judgment for that of the trier of fact).

**{¶ 164}** In addition, appellant argues that the transferred-intent theory does not apply in this case. But as we explained in our discussion of proposition of law No. X, even disregarding the doctrine of transferred intent, overwhelming evidence supported the jury's verdict that he murdered Ororo and attempted to murder Morales and Mister.

**{¶ 165}** Finally, appellant argues that inadequacies in the police investigation undermine the sufficiency of the evidence. In this regard, appellant alleges that investigators did not obtain phone records to verify Mister's claim that he talked to appellant before the shooting, Mister's mother did not testify that such a call was made, the two men who drove with appellant to Mister's residence were never apprehended and questioned, appellant's clothes from the day of the murder were never recovered, there was no evidence that police searched appellant's residence, the murder weapon was never found, and no DNA evidence linked appellant to the murder. Appellant also suggests that there was a rush to judgment because he was indicted about 40 hours after the murder occurred.

**{¶ 166}** Appellant essentially argues that the state's evidence could have and should have been better than it was. Even if that is true, however, the state need only have had sufficient evidence, not the best possible evidence, to survive a challenge on insufficiency grounds. *State v. Dye*, 9th Dist. Summit No. 17763,

1997 WL 119563, *8 (Mar. 12, 1997), *rev'd on other grounds*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998).

{¶ 167} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to *examine the evidence admitted at trial* to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Emphasis added.) *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus. Here, eyewitness testimony, forensic evidence, and circumstantial evidence were sufficient to support appellant's convictions. This evidence, if believed, would have convinced the average mind that appellant was guilty beyond a reasonable doubt.

*2. Manifest weight of the evidence*

{¶ 168} To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 169} In his argument that the manifest weight of the evidence did not support his convictions, appellant provides the same list of reasons he provides in arguing that there is no credible evidence upon which the jury could have determined that he was the shooter. Appellant also argues that the GSR found on him did not prove that he was the shooter, and he contends that multiple witnesses said that the shooter wore dreadlocks. The challenges to Mister's and Morales's testimony are not convincing. Neither are appellant's arguments that the jury improperly weighed the GSR evidence or the statements regarding the shooter's hair. This is not the " 'exceptional case in which the evidence weighs heavily

against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. Given the strength of the direct and circumstantial evidence, we conclude that the jury neither lost its way nor created a miscarriage of justice in convicting appellant of the aggravated murder of Ororo and the attempted murders of Morales and Mister.

{¶ 170} We reject propositions of law Nos. I and II.

## L. Prosecutorial misconduct

{¶ 171} In proposition of law No. XVI, appellant argues that prosecutorial misconduct during various phases of the proceedings denied him a fair trial. However, except when noted below, appellant failed to object and therefore has forfeited all but plain error. *See Murphy*, 91 Ohio St.3d at 532, 747 N.E.2d 765.

{¶ 172} When reviewing a claim of prosecutorial misconduct, "the relevant question is whether the prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 125, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To answer that question, we consider whether the challenged conduct was improper and whether it prejudicially affected the defendant's substantial rights. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In evaluating prejudice, we determine the effect of the misconduct "on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

### 1. Repeated misconduct allegations

{¶ 173} Appellant recasts several of his previous arguments into claims of prosecutorial misconduct. First, he repeats his arguments from propositions of law Nos. III and IV that the prosecutor committed misconduct before the grand jury. We reject those arguments for the reasons we explained above.

{¶ 174} Second, appellant argues that the prosecutor presented victim-impact testimony from Traniece Wilkins during the trial phase. As we explained in discussing proposition of law No. VII, Traniece's brief testimony about Ororo

was neither overly emotional nor directed to the penalty. *See Hartman*, 93 Ohio St.3d at 293, 754 N.E.2d 1150. No plain error occurred.

**{¶ 175}** Appellant also complains that the prosecutor improperly elicited testimony from Officer Shields that this was the "most gruesome scene" she had witnessed. As we explained in discussing proposition of law No. VII, this testimony was irrelevant but curative instructions corrected any error. In addition, Shields's testimony that Mister's shorts were "saturated in blood and brain matter" was not improper because this information established the condition of Ororo's body at the scene.

**{¶ 176}** Finally, appellant argues that the prosecutor committed misconduct in discussing Officer Shields's testimony during the prosecutor's trial-phase closing argument. But as we explained in discussing proposition of law No. VII, no plain error occurred, and we reject these claims.

*2. Sentencing determination as an "evidence-based" decision*

**{¶ 177}** Appellant argues that the prosecutor improperly told the jurors during voir dire, her penalty-phase opening statement, and her penalty-phase closing argument that choosing the appropriate sentence was an "evidence-based" decision.

**{¶ 178}** During her penalty-phase opening statement, the prosecutor said, "[T]his is an evidence-based decision. * * * It is not a decision based on sympathy, prejudice, bias." During her closing argument, she stated, "The evidence in this case is going to tell you what the right sentence is for the Defendant. That's what we ask you to do. Set aside emotion, set aside sympathy and make your decision based on the law * * *."

**{¶ 179}** Appellant argues that the prosecutor's comments that the jury's sentencing determination was an "evidence-based" decision precluded the jury's consideration of mercy. But the prosecutor never mentioned mercy during voir dire, her opening statement, or her closing argument. And, in any event, this court

has long held that "mercy is not a mitigating factor." *E.g.*, *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 88; *accord State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993) ("mercy * * * is irrelevant to the duty of the jurors").

{¶ 180} Appellant cites *Kansas v. Carr*, __U.S__, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), in arguing that the prosecutor misstated the law in describing the jury's sentencing determination as an "evidence-based" decision. In *Carr*, the Supreme Court of the United States held that the Eighth Amendment "does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt.' " *Id*. at __, 136 S.Ct. at 642, quoting *State v. Gleason*, 299 Kan. 1127, 1197, 329 P.3d 1102 (2014), *rev'd sub nom. Carr*.

{¶ 181} Appellant relies on dictum in *Carr* stating:

> And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained. It would mean nothing, we think, to tell the jury that the defendants must deserve mercy beyond a reasonable doubt; or must more-likely-than-not deserve it. * * * If we were to hold that the Constitution requires the mitigating-factor determination to be divided into its factual component and its judgmental component, and the former to be accorded a burden-of-proof instruction, we doubt whether that would produce anything but jury confusion. *In the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not*, which is what our case law is designed to achieve.

(Emphasis added.) *Id*. But this dictum does not support appellant's argument that the prosecutor misled the jury in describing its sentencing determination as an "evidence-based" decision because the dictum states that instructions on the burden of proof for mercy are neither useful nor required.

{¶ 182} Nothing in *Carr* supports appellant's argument that the prosecutor misstated the law. The prosecutor committed no plain error in telling the jurors that whether the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt was an "evidence-based" decision.

### 3. Commenting on defense's failure to call witnesses

{¶ 183} Appellant argues that the prosecutor's comment during her trial-phase closing argument that the defense failed to call Shantwone Jenkins as a witness and failed to call any other witnesses implicated appellant's right to remain silent and shifted the burden of proof.

{¶ 184} The prosecutor may comment on the failure of the defense to offer evidence in support of its case. *McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 293. "Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." *State v. Collins*, 89 Ohio St.3d 524, 527-528, 733 N.E.2d 1118 (2000).

{¶ 185} During her trial-phase closing argument, the prosecutor said, "You heard a lot of cross examination of the number of the witnesses as well as Mister and [Morales] and the police officers about Shantwone Jenkins. The only thing I'll tell you is the defense has the right to call witnesses, just like the state does." This comment about the defense's right to call witnesses was permissible and did not result in plain error.

{¶ 186} The prosecutor made a similar comment during her rebuttal argument. During his closing argument, defense counsel had remarked that two people saw the shooter wearing dreadlocks. Appellant contends that it was in

response to this remark that the prosecutor argued during rebuttal, over defense objection, that the jury had been told that appellant was the shooter by both Mister and Morales—"independent witnesses * * * from completely different vantage points, one from upstairs, one from on the porch. And I will tell you, again, the defendant has the right to call any witnesses he wants." Regardless of what, if any, defense argument they were referring to, these were permissible rebuttal comments.

### 4. Statements about mitigating factors

{¶ 187} Appellant challenges as improper the prosecutor's comments during her penalty-phase opening statement and closing argument that mitigating factors diminish or lessen the appropriateness of the death penalty.

{¶ 188} The prosecutor's comments did not result in plain error. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 138. And in any event, the trial court fully instructed the jury on the appropriate weighing of the mitigating factors.

{¶ 189} We reject proposition of law No. XVI.

### M. Ineffective assistance of counsel

{¶ 190} In proposition of law No. XVII, appellant raises various claims that his trial counsel provided ineffective assistance. As we noted in our discussion of proposition of law No. IX, both deficient performance and prejudice are required to justify reversal based on ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### 1. Failure to challenge biased juror

{¶ 191} Appellant argues that his counsel were ineffective by failing to challenge for cause prospective juror No. 508, who was ultimately seated on the jury.

{¶ 192} In *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court of the United States held that a prospective juror who would automatically vote for a death sentence without regard to

mitigating factors is biased and may not sit in a capital case. Furthermore, a prospective juror whose views on capital punishment would prevent or substantially impair his or her ability to consider mitigating factors as the law requires should be excused. *Id*. at 728; *Murphy*, 91 Ohio St.3d at 526, 747 N.E.2d 765.

{¶ 193} During voir dire, prospective juror No. 508 was asked whether she would be able to sign a death verdict. She responded, "Well, my thing too is, okay, you get the death penalty and then you sit in prison for 20 years. You know, I don't understand that." During further questioning, the prosecutor asked her whether she could consider mitigating evidence, such as "childhood, upbringing, anything that [the defense] would like for you to consider in making this decision." Prospective juror No. 508 responded, "I guess if they brought it to me, I'd have to think about it, but you can't use that as an excuse."

{¶ 194} The prosecutor later told prospective juror No. 508, "So you can put as a juror whatever weight you want to put on any mitigation information they give you. You may think it's all a bunch of crap, and that's okay too. That is up to you, as long as you listen to it and deliberate and talk about it." Prospective juror No. 508 indicated that she could consider any mitigating factors presented and weigh them. But she added, "I wouldn't put a lot of emphasis [on] the upbringing and stuff" and "I know you can listen to it, but, yeah, that might not affect me." Upon further questioning, prospective juror No. 508 agreed to listen to any mitigating evidence that the defense presented and engage in the weighing process.

{¶ 195} Appellant attacks defense counsel's failure to challenge prospective juror No. 508 following her statement that she "wouldn't put a lot of emphasis" on mitigating evidence about a defendant's background and upbringing. Appellant argues that prospective juror No. 508's comments show her inability to consider mitigating factors as the law requires. However, the rest of prospective juror No. 508's answers do not show that she was biased or unwilling to fully

consider mitigating evidence. Prospective juror No. 508 assured the court that she would follow the law, would not automatically vote for a death sentence, and would consider any mitigating evidence that the defense presented.

{¶ 196} Appellant also argues that prospective juror No. 508 would give no weight to mitigating evidence after the prosecutor told the prospective juror that she might "think it's all a bunch of crap." These remarks were inappropriate. But nothing in the record of voir dire shows that prospective juror No. 508 was incapable of properly considering mitigating evidence that was later presented. Accordingly, appellant fails to show that the trial court would have granted a defense challenge for cause against this prospective juror, and this ineffectiveness claim lacks merit. *See Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 76.

{¶ 197} In addition, appellant contends that defense counsel were ineffective in questioning prospective juror No. 508. But defense counsel is entitled to broad discretion in formulating voir dire questions. *See State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139. And appellant does not indicate what additional questions counsel should have asked.

{¶ 198} Finally, appellant argues that defense counsel should have removed prospective juror No. 508 with a peremptory challenge. Decisions on the exercise of peremptory challenges are a part of trial strategy. *Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 264. Prospective juror No. 508's answers did not indicate that she would be an automatic-death-penalty juror. Prospective juror No. 508 also expressed uncertainty about signing a death verdict and equivocated when asked whether she favored the death penalty. Under these circumstances, defense counsel may have decided that prospective juror No. 508 would be favorable to the defense. *See Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 66. We reject this claim.

*2. Failure to request an expert on eyewitness identification*

**{¶ 199}** Appellant argues that defense counsel were ineffective by failing to present expert testimony as to the unreliability of eyewitness identification. Appellant argues that an expert on eyewitness testimony was crucial because Mister's and Morales's identifications of appellant were the basis for his convictions.

**{¶ 200}** As an initial matter, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Defense counsel's decision to rely on cross-examination rather than call an expert is a matter of trial strategy. *See State v. Coleman*, 45 Ohio St.3d 298, 307-308, 544 N.E.2d 622 (1989).

**{¶ 201}** Appellant cites *People v. Lerma*, 2016 IL 118496, 400 Ill.Dec. 20, 47 N.E.3d 985, in arguing that his counsel were ineffective. In *Lerma*, the trial court denied a defense request for an expert witness to testify on the reliability of eyewitness identifications. *Id*. at ¶ 24. The only evidence of the defendant's guilt was the eyewitness identifications of the defendant made by the victim, who later died, and another person who had never met the defendant and knew him only by a nickname. *Id*. at ¶ 5-6. The Supreme Court of Illinois held that the trial court erred by denying the defense request for an expert on eyewitness identification. *Id*. at ¶ 32. The court noted that several factors potentially contribute to the unreliability of eyewitness identification, including "the stress of the event itself, the use and presence of a weapon, the wearing of a partial disguise, exposure to postevent information, nighttime viewing, and cross-racial identification." *Id*. at ¶ 26.

**{¶ 202}** We do not deny that eyewitness identification can be unreliable. But unlike the surviving eyewitness in *Lerma*, Mister and Morales both were acquainted with appellant before the shooting, and the events occurred during

daylight rather than at night. *See id.* at ¶ 26 and fn. 4. In view of the evidence, appellant's counsel were not ineffective by failing to obtain an expert on eyewitness identification. *See Keeling*, 1st Dist. Hamilton No. C-010610, 2002-Ohio-3299, at ¶ 8 (decision to forego an eyewitness expert is a recognized trial strategy). We reject this ineffectiveness claim.

### 3. Failures in presenting mitigating evidence

{¶ 203} Appellant argues that defense counsel failed to discover all reasonably available mitigating evidence and failed to present mitigating testimony effectively.

{¶ 204} The presentation of mitigating evidence is a matter of trial strategy. *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 274. Counsel in a capital case has an " 'obligation to conduct a thorough investigation of the defendant's background' to determine the availability of mitigating evidence." *State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 69, quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

{¶ 205} Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " (Emphasis added in *Wiggins*.) *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), quoting American Bar Association, *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, section 11.4.1(C), at 93 (1989).

> This constitutionally required background investigation is necessary to enable counsel to make strategic choices about presenting a mitigation defense. * * * Indeed, the deference owed to counsel's strategic judgments about mitigation is directly

proportional to the adequacy of the investigations supporting such judgments. * * * Accordingly, when evaluating the reasonableness of counsel's mitigation strategy in a capital case, "a reviewing court must consider the reasonableness of the investigation said to support that strategy."

*Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir.2008), quoting *Wiggins* at 527.

**{¶ 206}** Defense counsel employed Sandra B. McPherson, Ph.D., a forensic psychologist, and Donald McPherson as the defense mitigation team. Billing records show that beginning in September 2013, seven months before the mitigation hearing, the mitigation team interviewed appellant on several occasions, performed numerous tests, reviewed records, and interviewed his family members.

**{¶ 207}** At the mitigation hearing, defense counsel called three mitigation witnesses: Tikisha D'Altorio, the mother of appellant's child; Tracy Lynell Wilks, appellant's half-brother; and Patricia Wilks, appellant's mother. These witnesses discussed appellant's background, his employment, and the love and support that he provides for his child. Appellant also made an unsworn statement in which he maintained his innocence but expressed his condolences to the Wilkins family. He also requested leniency.

**{¶ 208}** Appellant argues that his counsel were deficient by failing to develop the testimony of these witnesses. He asserts that counsel should have presented additional testimony concerning appellant's interaction with his son and his relationship with Tracy. Appellant also contends that his mother should have discussed his early life in Alabama and the reasons the family moved to Youngstown and that she should have provided more information about appellant's father and her relationship with him. But "[t]he decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective

assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997).

**{¶ 209}** It is unclear why defense counsel did not present additional testimony about appellant's background. But nothing in the record suggests that the absence of additional testimony was the result of inadequate investigation. Moreover, it is highly speculative whether additional testimony from these witnesses would have added anything to appellant's mitigation case or made any difference in the outcome of the penalty phase. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 124. Appellant has failed to establish that defense counsel were ineffective in preparing for the penalty phase or in presenting mitigating evidence. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 288.

*4. Arguing for life imprisonment rather than life without possibility of parole*

**{¶ 210}** Appellant argues that defense counsel were ineffective by arguing against life imprisonment without the possibility of parole as a possible sentence.

**{¶ 211}** During his penalty-phase argument, defense counsel made the following plea for a life sentence: "*I implore you, life*. This is not—it's the hardest thing to come to somebody and say, 'We know this thing happened. Give weight to this,' but give weight to it. As much weight as you can. We're not expecting something like, you know, life without the possibility of parole."

**{¶ 212}** Appellant cites the ABA guidelines, which state, "Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.11(L) (Rev.Ed.2003). Appellant argues that these guidelines meant that his counsel should not have argued against a sentence of life imprisonment without the possibility of parole. But the ABA guidelines are

not "inexorable demands" with which all capital defense counsel must fully comply. *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009).

**{¶ 213}** Moreover, defense counsel adopted a reasonable trial strategy in arguing for a life sentence instead of life without the possibility of parole. A reasonable attorney could have hoped that the jurors would view a life sentence as a reasonable alternative to sentencing appellant to death. Appellant also fails to show prejudice, as it cannot be said that there was a reasonable likelihood of a different outcome had trial counsel argued for life imprisonment without the possibility of parole.

*5. Waiver of appellant's presence at conferences*

**{¶ 214}** Appellant argues that defense counsel waived appellant's presence during various proceedings without obtaining his consent.

**{¶ 215}** An accused has a fundamental right to be present at all critical stages of his criminal trial. Article I, Section 10, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis added.) *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934).

**{¶ 216}** Appellant asserts that defense counsel improperly waived his presence during the following conferences held outside the jury's presence: (1) review of jury-excusal letters from two prospective jurors; (2) discussion with a juror of whether he knew a potential witness; (3) consideration of an evidentiary objection; (4) renewal of defense objections to trial-phase jury instructions; (5) consideration of a defense objection to penalty-phase jury instructions; and (6) discussion with an upset juror who was ultimately excused from the penalty-phase jury. But defense counsel were present during all of these proceedings.

{¶ 217} The conferences involving juror excusals, an evidentiary objection, and discussions about jury instructions involved legal matters within the professional competence of counsel. Appellant contends that counsel may not waive a client's right to be present, but he is incorrect. *See, e.g.*, *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 103; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 144. And in any event, appellant's absence from these conferences was not prejudicial, as the jury received no testimony or evidence in his absence. *See Hale* at ¶ 103.

{¶ 218} Defense counsel could also waive appellant's presence during an in-chambers conference about whether juror No. 11 knew a potential witness. The prosecutor said that the potential witness would not be called, and the conference ended. Appellant does not show that he was prejudiced by his absence during this brief conference. *See United States v. Brown*, 571 F.2d 980, 987 (6th Cir.1978) (to show reversible error based on his or her absence at an in-chambers conference, an accused must establish prejudice).

{¶ 219} Finally, appellant complains about his absence during an in-chambers conference with juror No. 3 about her emotional state, which led to her excusal. We addressed a similar situation in *State v. Williams*, 6 Ohio St.3d 281, 285-287, 452 N.E.2d 1323 (1983).

{¶ 220} In *Williams*, the trial court conducted an in camera voir dire of jurors about an unauthorized communication with the jury. *Id*. at 285. Defense counsel was present during the voir dire, but the accused was not. *Id*. at 286. We held that the trial court's action constituted harmless error. *Id*. at 286-287. We reasoned that the defendant's counsel more than adequately represented his interests and the defendant's presence at voir dire would have contributed little to his defense. *Id*. Like the defendant in *Williams*, appellant was absent from only an isolated proceeding after the jury had already been selected. And even assuming

that counsel improperly waived his presence, appellant suffered no prejudice. We reject this claim.

### 6. Other allegations of ineffective assistance

{¶ 221} Appellant raises other instances of alleged ineffectiveness of counsel, but none have merit. As we explained in discussing other propositions of law, appellant was not prejudiced by counsel's failure to object to conducting voir dire in the jury room (No. V), failing to object to the prosecutor's voir dire questioning (No. XVI) or acquiescing in the removal of prospective juror No. 481 (No. VI). Appellant was also not prejudiced by counsel's failure to object to the introduction of evidence of the 9 mm handgun (No. VIII), alleged prosecutorial misconduct (Nos. VII and XVI), jury instructions (No. IX), the prosecutor's penalty-phase closing argument (No. XVI) or the trial court's closing the courtroom doors during the penalty-phase instructions (No. V).

### 7. Cumulative error

{¶ 222} Finally, appellant argues that defense counsel's cumulative errors and omissions violated his constitutional rights. However, because none of appellant's claims of ineffective assistance have merit, he cannot establish a right to relief by simply joining those claims together. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 173.

{¶ 223} We reject proposition of law No. XVII.

### N. Instructions on mercy and residual doubt

{¶ 224} In proposition of law No. XIV, appellant argues that the trial court erred by denying his request that the jury be instructed on mercy. This court has consistently rejected similar claims. *See Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 131; *Lorraine*, 66 Ohio St.3d at 417-418, 613 N.E.2d 212. And contrary to appellant's claims, in neither *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), nor *Carr*, __U.S.__, 136 S.Ct. 633, 193

L.Ed.2d 535, did the Supreme Court of the United States hold that a defendant is entitled to an instruction on mercy. We reject proposition of law No. XIV.

{¶ 225} In proposition of law No. XV, appellant argues that the trial court violated his constitutional rights by denying his request for a jury instruction on residual doubt. Appellant was not entitled to an instruction on residual doubt. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 192; *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus. We reject proposition of law No. XV.

### O. Cumulative error

{¶ 226} In proposition of law No. XVIII, appellant argues that cumulative errors during both phases of the proceedings deprived him of a fair trial and a reliable sentencing hearing. We reject this claim because appellant was not prejudiced by any error at his trial.

### P. Constitutionality of capital punishment

{¶ 227} In proposition of law No. XIX, appellant challenges the constitutionality of Ohio's death-penalty statutes and claims that they violate international law and treaties to which the United States is a party. We have rejected these arguments previously. *See, e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280.

{¶ 228} In addition, in his reply brief, appellant argues that Ohio's capital-sentencing procedures violate the Sixth Amendment under *Hurst v. Florida*, 577 U.S.__, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). We will generally not consider a new issue presented for the first time in a reply brief. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18; *see also State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 84-85 (declining to address *Hurst* claim when raised for the first time during oral argument). But in any event, we recently rejected appellant's claim in *State v. Mason*, __Ohio St.3d__, 2018-

Ohio-1462, __ N.E.3d __ (holding that Ohio's capital-sentencing scheme is unlike the one at issue in *Hurst*).

{¶ 229} We reject proposition of law No. XIX.

### Q. Appropriateness and proportionality of the death sentence

{¶ 230} In proposition of law No. XIII, appellant argues that the death sentence is not an appropriate sentence for him because of his history, his background, the nature of the offenses, and his proclamations of innocence from the time of his arrest. He also argues that his sentence is not proportional to the sentences in other aggravated-murder cases tried in Mahoning County. We will consider the appropriateness and proportionality of appellant's death sentence in our independent evaluation of the sentence.

### IV. INDEPENDENT SENTENCE EVALUATION

{¶ 231} Having considered appellant's propositions of law, we must now independently review appellant's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

### 1. Aggravating circumstance

{¶ 232} Appellant was convicted of murdering Ororo Wilkins as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons (i.e., Ororo, Morales, and Mister) in violation of R.C. 2929.04(A)(5).

{¶ 233} The evidence presented at trial supports the jury's finding of guilt as to the course-of-conduct aggravating circumstance. The evidence showed that on May 21, 2013, appellant and Mister had a confrontation over bank cards that belonged to Mister's mother. Later, appellant and Mister had a heated discussion on the phone and appellant told Mister that he was going to kill him. Shortly thereafter, appellant drove to Mister's home. He shot Morales in the back and shot Ororo in the head, killing her. Appellant also shot at Mister when he appeared in an upstairs window.

**2. Mitigating evidence presented**

{¶ 234} Against the course-of-conduct aggravating circumstance, we must weigh the mitigating factors contained in R.C. 2929.04(B). Appellant called three witnesses and made an unsworn statement during the penalty phase.

{¶ 235} Tikisha D'Altorio, the mother of appellant's son, testified that appellant had been attentive to his three-year old son since the child was born. Appellant was present at his son's birth, had seen him daily, and had supported him financially. Appellant held two jobs before his arrest.

{¶ 236} Tracy Lynell Wilks, appellant's half-brother, testified that appellant had been attentive and had provided financial support for appellant's son. Appellant had worked full time and had been employed at *The Vindicator* newspaper and O'Charley's restaurant. Appellant also loves his mother and had been attentive to her needs.

{¶ 237} Patricia Wilks, appellant's mother, testified that she moved from Alabama to Ohio when appellant was nine months old. That was the last time that appellant saw or had any interaction with his father. Patricia at one time had an alcohol problem but had stopped drinking on her own.

{¶ 238} Appellant was living with his mother and her brother, Fred Perkins, at the time of the offenses. Appellant had been very attentive to the needs of his mother and Perkins, who suffers from schizophrenia. Patricia loves her son and wants him to live. During cross-examination, Patricia testified that she always took care of her sons and made sure that they had a place to live and were safe. She also said that appellant has a religious background.

{¶ 239} In an unsworn statement, appellant expressed his "heartfelt condolences to the Wilkins family for the loss of a beautiful person." He said that "Ororo will be dearly missed and forever deeply loved by every person who had the pleasure of coming in contact with her, including myself." Appellant apologized for his "disruptive and disrespectful reaction to the verdicts as they were

read." He especially apologized to the judge for his behavior, stating, "Sir, you have treated me with respect, dignity and consistent fairness since I first laid eyes on you. * * * I apologize to you, sir, and I meant no disrespect to you, sir." Appellant then told the jury that despite its verdict, "I know and God Almighty knows that I am, in fact, not guilty of any of these charges. Respectfully having expressed that, all that counts at this point is what you all believe * * *."

{¶ 240} Appellant asked for leniency for himself and on behalf of his son, stating:

> I ask for leniency with respect for my three-year-old son who will be victimized forever, and will likely fall victim as I did to the circumstances which this environment has to offer. With his father around, although incarcerated, as he comes of age, his actions and decisions will be afforded the benefit of being guided and aided by his loving father who has skimmed through the rubble of life that he's now beginning to navigate through. My position will serve as an absolute example of where bad decisions and thoughtless living will land him.

Appellant also asked for "leniency with respect to allowing what's hidden in the darkness to come to the light, because the true perpetrator of these crimes is not among you." In closing, appellant stated, "I commit my soul to the mercy of God through each of you 12 jurors in the hopes that you will thoughtfully and reflectively consider extending leniency upon my downtrodden soul with an open mind, even in the midst of what you believe I've done."

### 3. Independent weighing and proportionality

{¶ 241} Nothing in the nature and circumstances of the offense is mitigating. Appellant, then 41 years old, had an argument with Mister about

Mister's mother's bank cards. He later threatened to kill Mister. Appellant then went to Mister's house and killed Ororo, seriously wounded Morales, and shot at Mister.

{¶ 242} Appellant's history, character, and background provide little that is mitigating. His mother moved from Alabama to Ohio when appellant was a young child, and he grew up without knowing his father. His mother had a problem with alcohol, but she overcame this difficulty. No evidence was presented at trial showing a connection between appellant's upbringing and the murder and attempted murders.

{¶ 243} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 244} The first six statutory mitigating factors do not apply here. However, we give some weight to other mitigating evidence under the catchall provision of R.C. 2929.04(B)(7). That evidence includes appellant's upbringing in a broken home, the love that he shares with members of his family, his attentiveness to his mother's and uncle's needs, his financial support for his son, and evidence of his past employment. His expression of sympathy toward Ororo's family is also entitled to weight. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 319; *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 327.

{¶ 245} Appellant argues that his proclamations of innocence since the time of his arrest should also be given weight in mitigation. But his crimes were established by eyewitness testimony, forensic evidence, and circumstantial evidence. Moreover, residual doubt is not a mitigating factor. *See McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112, at syllabus.

{¶ 246} Appellant also argues that death is not an appropriate sentence because the two individuals who were allegedly in the car with him at the time of the offenses were not brought to justice. This disparity in treatment can be explained because the police were unable to locate and arrest these two men. In any event, we have held that "[d]isparity of sentence does not justify reversal when the sentence is neither illegal nor an abuse of discretion." *State v. Jamison*, 49 Ohio St.3d 182, 191, 552 N.E.2d 180 (1990); *see also State v. Eley*, 77 Ohio St.3d 174, 185-186, 672 N.E.2d 640 (1996) (although an accomplice was acquitted, the disparity in treatment did not justify reversal of the defendant's death sentence).

{¶ 247} Appellant also argues that the death sentence is not appropriate because only a single person died, Morales recovered from his wounds, and Mister was never hit by a bullet. He argues that this aggravating circumstance should not be given the same weight as in a case in which three people were killed. We reject appellant's claim, as we have previously upheld as appropriate a death sentence based solely on the course-of-conduct aggravating circumstance for one murder and one attempted murder. *See, e.g.*, *Sowell*, 39 Ohio St.3d at 337, 530 N.E.2d 1294.

{¶ 248} Upon independent weighing, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Appellant's murder of Ororo and attempted murders of Morales and Mister constitute a serious aggravating circumstance. His mitigating evidence is weak in comparison.

{¶ 249} Finally, we must determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). Appellant argues that his sentence is not appropriate when compared to other aggravated-murder cases tried in Mahoning County in which the death penalty was not imposed. However, we have held that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the

reviewing court in which the death penalty has been imposed." *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus.

**{¶ 250}** We conclude that the death penalty is both appropriate and proportionate when compared to other course-of-conduct murders for which the death penalty has been imposed. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836 (one murder and one attempted murder); *State v. Filiaggi*, 86 Ohio St.3d 230, 714 N.E.2d 867 (1999) (one murder and one attempted murder); *State v. Beuke*, 38 Ohio St.3d 29, 526 N.E.2d 274 (1988) (one murder and two attempted murders).

## V. CONCLUSION

**{¶ 251}** For all these reasons, we affirm the convictions and judgment of sentence, except that we set aside appellant's conviction for the lesser included offense of murder as to Count 1, which we hold merged with his conviction for aggravated murder charged in Count 1.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, SADLER, FISCHER, and DEWINE, JJ., concur.

LISA L. SADLER, J., of the Tenth District Court of Appeals, sitting for O'NEILL, J.

_____

Paul J. Gains, Mahoning County Prosecuting Attorney, and Ralph M. Rivera, Assistant Prosecuting Attorney, for appellee.

McGarry Law Office and Kathleen McGarry; and John P. Parker, for appellant.

_____