[Cite as *State v. Gibson*, 2021-Ohio-3614.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |
|---|---|
| STATE OF OHIO | : |
| | : |
| Plaintiff-Appellee | : Appellate Case No. 28769 |
| | : |
| v. | : Trial Court Case No. 2019-CR-3197 |
| | : |
| RICHARD J. GIBSON | : (Criminal Appeal from |
| | : Common Pleas Court) |
| Defendant-Appellant | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of October, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JOHNNA M. SHIA, Atty. Reg. No. 0067685, P.O. Box 145, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Richard J. Gibson was convicted in the Montgomery County Court of Common Pleas on 16 counts of rape of a child under the age of 13 following a jury trial. The trial court sentenced Gibson to an aggregate sentence of 160 years to life in prison.

{¶ 2} Gibson appeals from his convictions, raising the sufficiency and manifest weight of the evidence, the trial court's exclusion of impeachment evidence, and the legality and length of his sentence. Finding no reversible error, we affirm.

## I. Factual and Procedural Background

{¶ 3} The evidence presented at trial showed that Gibson and his former wife Tonya Molden (they were divorced in 2015) lived at Penn Garden Apartments in Riverside, Ohio, from March 1998 until December 2010, when they moved into the basement of Tonya's mother's house. Until February 2013, Gibson worked for Penn Gardens as a property manager and then in maintenance. In May 2010, nine-year-old T.R. moved into an apartment below Gibson's with her grandmother and the grandmother's husband, where they lived until April 2013, when T.R. was 12 years old.

{¶ 4} Gibson met T.R. when she became friends with his grandson, J.B., the son of Tonya's daughter Candice Molden. J.B. lived with his mother elsewhere, but he would stay with Gibson and Tonya on the weekends and on days Candice worked. At first, Gibson and T.R. were together only when J.B. was also around. But later Gibson started spending time alone with T.R. Gibson also began taking T.R. places alone, like his mother-in-law's house, school, dance class, the movies, and restaurants.

{¶ 5} T.R. testified at trial that their relationship started out positively but then changed. Gibson started getting physically close to her, being physically affectionate and touching her where he shouldn't. The touching turned sexual and led to further sexual

conduct, including intercourse, cunnilingus, and fellatio. T.R. said that most times that they had sex, Gibson would lay her down, get on top of her, and put his penis into her vagina. She said that he always wore a condom because, he told her, he didn't want her to get pregnant because he could go to jail. T.R. testified that even at trial, five years later, when she thought of this abuse, she could picture him on top of her, penetrating her and grunting, which she said was disgusting. T.R. said that the intercourse was painful, both physically and emotionally. When he would make her fellate him, T.R. testified, he would take his belt off and pull down his pants a little and tell her to open her mouth. He would lay down or stand and would use his hands to direct her head, telling her exactly what he wanted her to do. The encounters would end with Gibson ejaculating into a paper towel. T.R. testified that, when he performed cunnilingus on her, Gibson would lay her down, take her pants and underwear off, open her legs, and put his head down there and lick her vagina. Sometimes, she said, he would put his finger into her vagina.

{¶ 6} T.R. testified that these encounters took place countless times in Gibson's mother-in-law's house, in his apartment, in her apartment, and in the Penn Gardens rental office. At his mother-in-law's house, Gibson would sneak her into the basement, telling her to be quiet. There, Gibson would often tell T.R. to take off her clothes and lay on the couch, while he took his pants off, put a condom on, and had sex with her. One specific incident T.R. recalled was after her grandfather's funeral. T.R. had gotten home and was sitting outside, wearing an orange outfit with a skirt and shirt that her grandmother had bought for her. Gibson pulled up in his van, told her to get in, and took her to his mother-in-law's house. He told her to be quiet when they got into the house and to go downstairs and he'd be down in a minute. When Gibson came downstairs, he laid T.R. down on the

floor and put a pillow under her head so as to not mess up her hair. He took off her underwear and put his mouth on her vagina. Gibson then put on a condom, and they had sex. When he was done, he took off the condom and flushed it down the toilet. Gibson told T.R. that he flushed the condoms because he didn't want anyone to see them in the trash can.

{¶ 7} T.R. testified that, in Gibson's apartment, the encounters would occur in the living room, one of the bedrooms, or the kitchen. She said that in the kitchen Gibson would lay her on the floor, open her legs, lay on top of her, and put his penis inside of her. T.R. said that they also had sexual encounters in her apartment—in the living room or her bedroom—when her grandparents were at work.

{¶ 8} T.R. testified that Gibson also engaged in sexual conduct with her in the Penn Gardens rental office, which he had access to because he worked there. T.R. said that before taking her inside, Gibson would make sure no one else was there. He would then make her lay down on the desk and he would get on top of her and have sex with her. The office door locked on its own, T.R. said, and Gibson would close the blind in the office's window.

{¶ 9} Corroborating T.R.'s testimony was the testimony of Tonya Molden (Gibson's former wife), Candice Molden (Tonya's daughter), and several people who also lived at Penn Gardens when these encounters were occurring. Each described what they saw as an improperly close relationship between Gibson and T.R.

{¶ 10} Tonya testified that Gibson began spending time alone with T.R. in their apartment or at her mother's house. She said that Gibson's relationship with T.R. affected her relationship with him, as well as his relationship with his family, as he seemed

obsessed with T.R. Tonya was a self-employed hairdresser and would leave the apartment to give haircuts. Sometimes when she came back, T.R. and Gibson would be alone in the apartment, usually playing video games. Tonya recalled a time while she and Gibson were living with her mother that she had arrived home and Gibson was downstairs alone with T.R. Tonya told him that her mother was not comfortable with the two of them being there alone. Tonya testified that she told Gibson that his relationship with T.R. did not look right and not to take T.R. to her mother's house anymore. Tonya had also seen T.R. in the rental office with Gibson.

{¶ 11} Candice did not like Gibson's relationship with T.R. either. She testified that she went to Penn Gardens once and tried to find Gibson. She went to the rental office while he was working and knocked on the locked door. After a few moments, she started knocking harder. A minute or two later, T.R. answered the office door. Candice saw Gibson coming out of the bathroom and noticed that T.R. seemed a little jittery. Candice asked what was going on and why the door was locked. She told Gibson that it was inappropriate. Gibson responded that he was allowed to lock the door whenever he wanted and that it was none of her business.

{¶ 12} Amber Vahle worked with Gibson for a short time at Penn Gardens. She testified that whenever she saw Gibson, T.R. was there too. Vahle said that, in the rental office, Gibson hung up artwork that T.R. had made and that he seemed obsessed and affectionate with T.R., but not in a fatherly way. She said that when T.R. was with Gibson he would not let her talk to other people, would get close to her face, and would always be touching or hugging her. Vahle saw feminine hygiene products in the rental office bathroom that Gibson had purchased for T.R.

{¶ 13} Michael Jackson was a tenant and worked for Penn Gardens. He testified that one day he went to the rental office looking for Gibson. Jackson knocked on the rental office door a few times, but there was no answer. Peering through the office window, Jackson saw Gibson walking while adjusting his pants. Gibson saw Jackson at the window and immediately turned his back before opening the door. After talking to Gibson for a few minutes, Jackson saw T.R. come from the back into the office. Jackson described their relationship as inappropriate and not fatherly. He too said that every time he saw Gibson, T.R. was there too. Jackson testified that, multiple times while sitting on his patio in the evening, he had seen T.R. and Gibson alone in Gibson's van. Jackson would watch them pull up and then 10-15 minutes later, T.R. would get out and go inside. Jackson also said that he saw Gibson pat T.R. on her behind multiple times.

{¶ 14} T.R. did not tell anyone about the abuse at the time. She testified that Gibson told her that they were going to keep their encounters a secret and that she felt that if she told, she would get in trouble. But five years later, in February 2018, she happened to see Gibson at Walmart. He saw her too and stared at her before they parted without speaking. The following month, T.R. woke up crying. She couldn't stop and was eventually taken by ambulance to Good Samaritan Hospital. There, she told a nurse that she had been raped by a neighbor named "Richard" (she wasn't sure of his last name) when she was around seven or eight years old. T.R. described him as old and hairy with a small dragon tattoo on his shoulder and said that he might have a tattoo on his leg. T.R. was interviewed at CARE House and discussed what had happened with forensic interviewers. She was referred to counseling, but she did not attend, because, she said, she did not like talking about what had happened.

{¶ 15} The State presented the testimony of Dr. Brenda Joyce Miceli, a pediatric psychologist and expert in child sexual abuse and child psychology. Dr. Miceli testified generally about the typical patterns she sees as a child sexual abuse psychologist and about the wide range of behavioral characteristics displayed by child victims of sexual abuse. Dr. Miceli said that even though most children are referred to counseling, they often do not go. She also said that, in general, most children do not lie about sexual abuse, and, if they do lie, they tend to have motivation to lie, like to get out of trouble. Dr. Miceli said that she did not have any contact with T.R. and did not review any reports about this case. (T.R. was not her patient.) She noted that not every case is the same but that most cases of childhood sexual abuse involve delayed disclosure and that many victims are adults before they tell anyone, if they tell anyone.

{¶ 16} Detective Travis Abney, who worked for the City of Riverside Police Department, was assigned to this case. He testified that since this was a delayed-disclosure case, his investigation focused on trying to corroborate the time-frames in which T.R. said the rapes occurred, talking to people who knew her and Gibson to determine if Gibson had access to her. Abney was able to verify with many people and family members that both T.R. and Gibson had lived at Penn Gardens, that Gibson had worked there and had access to the rental office, and that T.R. had been to Gibson's mother-in-law's house. Detective Abney said that he came across photos on Gibson's Facebook page showing T.R.'s name tattooed on Gibson's arm, which Abney found chilling. He testified that he had a lot of training and experience investigating sexual crimes and that it was his experience that abusers keep souvenirs or mementos of their victims.

{¶ 17} After the State rested, Gibson presented his defense. First, he presented the testimony of Alissa Mason, a friend and tenant at Penn Gardens. She testified that her daughter would play with J.B. and T.R. and that T.R. would often come to her apartment. Mason testified that she saw Gibson around T.R. quite often but did not see anything unusual about their relationship. She said that it seemed to her like Gibson was trying to be a father figure to T.R. Mason never saw Gibson touch T.R. inappropriately, but she did see him hug and high-five her.

{¶ 18} Gibson himself then took the stand. He denied ever engaging in any sexual conduct with T.R. He said that he befriended T.R. after she and his grandson J.B. became friends. Gibson said that a bond was soon created between them and that she would follow him around. He testified that he tried to be a father figure to her because he wanted her to have a better life. Gibson claimed that he had been alone with T.R. outside only and that they had never been alone together inside. Gibson did admit that he took her places alone, like dance classes and restaurants. Gibson explained that he got the tattoo of her name (and his grandson's) "so he had them with him anytime he did something good." (Vol. II Tr. 288, 296.) Gibson said that T.R. was simply wrong about numerous things: he never did any of the things to her that she alleged; they were never alone inside anywhere; he never told her to not talk about the things he was doing to her; and he never said anything about condoms or getting her pregnant. Gibson said he had no tattoo on his leg but admitted that he was hairy and had a small dragon tattoo on his shoulder blade.

{¶ 19} Gibson was indicted on 16 counts of rape under R.C. 2907.02(A)(1)(b) (less than thirteen years of age). The jury found him guilty on all counts. On March 19, 2020,

the trial court sentenced him to a mandatory prison term of 10 years to life on each count and ordered that he serve the terms consecutively, for an aggregate sentence of 160 years to life in prison.

{¶ 20} Gibson appeals.

## II. Analysis

{¶ 21} Gibson presents four assignments of error. The first challenges the sufficiency and manifest weight of the evidence. The second challenges the trial court's exclusion of extrinsic evidence of a prior inconsistent statement made by T.R. And the third and fourth assignments of error challenge his prison sentence.

## A. Sufficiency and Weight of the Evidence

{¶ 22} The first assignment of error alleges:

The Evidence Presented at Trial was Insufficient and Against the Manifest

Weight of the Evidence to Sustain Gibson's Convictions.

{¶ 23} R.C. 2907.02(A)(1)(b) pertinently provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender" when "[t]he other person is less than thirteen years of age." The statutory definition of "sexual conduct" includes "vaginal intercourse," "fellatio, and cunnilingus," and "the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶ 24} Each of the 16 rape counts alleged that Gibson engaged in one of four types of sexual conduct with T.R.—vaginal intercourse, vaginal penetration, cunnilingus, or fellatio—at one of four locations—Gibson's apartment, T.R.'s apartment, the rental office, or Gibson's mother-in-law's house. There was no dispute as to T.R.'s age. The issue in

this case was whether Gibson engaged in sexual conduct with her. Gibson argues that the evidence was insufficient, largely because T.R.'s testimony about the sexual conduct, he says, merely parroted the statutory language. Gibson's manifest-weight argument attempts to show that the jury should not have believed T.R.'s claims of rape.

{¶ 25} We consider both evidentiary challenges together in our analysis. "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. "Consequently, 'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *State v. Curtis*, 2020-Ohio-4152, 157 N.E.3d 879, ¶ 44 (2d Dist.), quoting *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15. Accordingly, our review of the weight of the evidence also suffices to determine Gibson's sufficiency challenge.

{¶ 26} "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} T.R. testified that Gibson engaged in vaginal intercourse, fellatio, and cunnilingus with her and put his finger into her vagina. And she testified that he did each of these things in his apartment, in her apartment, in the apartment office, and at his mother-in-law's house. T.R. gave many details about these encounters, beyond simply stating that he did each of the sexual acts. The testimony of the State's other witnesses tended to corroborate T.R.'s testimony. Gibson testified at trial that T.R. was wrong and that he did not engage in any sexual conduct with her. Ultimately, the jury believed T.R. over Gibson.

{¶ 28} "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." (Citation omitted.) *Id.* at ¶ 67. Because witness credibility is a matter for the trier of fact to resolve, a jury does not lose its way simply because it chooses "to believe the State's witnesses and disbelieve Defendant, which it was entitled to do." *Id.* at ¶ 69. The evidence here was clearly sufficient to find Gibson guilty on all the rape charges. The only real argument left to Gibson was that T.R. was lying. And that is the conclusion that his manifest-weight argument urges, based on various inconsistencies and conflicts in her testimony.

{¶ 29} Gibson points out that T.R. told the nurse at the hospital that the abuse happened when she was seven or eight years old, which was before she had met Gibson. Moreover, he argues that T.R. described her abuser as having a tattoo on his leg, which

he did not have; T.R. also said that he had a tattoo of a small dragon on his shoulder, but his tattoo was on his shoulder *blade*. In our view, none of these inconsistencies rendered T.R.'s testimony unbelievable. At trial, T.R. admitted that she was wrong about when the abuse happened. As to her physical description of Gibson, T.R. told the nurse that her abuser's first name was "Richard" and that he was old and hairy, which Gibson admitted he was. While she was mistaken about the leg tattoo, Gibson is caviling when he brings up her description of his dragon tattoo's location.

{¶ 30} Gibson also argues that T.R.'s articulation of how each sexual act occurred was generic. In her testimony, T.R. repeatedly said that Gibson had engaged in four types of sexual conduct with her in each of four places. Gibson argues that she could not articulate and identify each sexual act at each location without being led by the prosecutor; she was able only to generally describe the act itself (e.g., penis in vagina, penis in her mouth, mouth on her vagina, and fingers in her vagina). T.R. was general and repetitive, says Gibson, about how each act occurred. Gibson also points out that T.R. could not remember when the acts occurred—whether during the spring or winter, the summer or fall, during school or after school, or whether she was wearing her school uniform or regular clothing. We don't think that any of this was significant and see no problem with T.R. testimony as to how and when the sexual conduct occurred.

{¶ 31} Gibson also argues that T.R.'s initial disclosure was not credible. He says that her claims of abuse were not reliable and were simply based on a bad dream. This argument is belied by T.R.'s testimony describing the sexual encounters. Gibson points out that T.R. did not say anything to anyone about the abuse for five years, but the delayed disclosure was not unusual. Dr. Miceli explained that many people who are

victims of childhood sexual abuse delay their disclosure for more than two years, and even until adulthood, if they ever disclose the abuse. T.R. herself explained that she did not want anyone to know about the abuse, because even five years later, she still felt guilty for what had happened.

{¶ 32} After considering all of Gibson's arguments, we are not convinced that the jury was wrong to believe T.R. This is not the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. We conclude that the jury neither lost its way nor created a miscarriage of justice in finding Gibson guilty of the rape charges.

{¶ 33} The first assignment of error is overruled.

### B. Extrinsic evidence of a prior inconsistent statement

{¶ 34} The second assignment of error alleges:

The Trial Court abused its discretion when it sustained the State's objection to Defense counsel's evidence of a prior inconsistent statement of the complaining witness.

{¶ 35} Gibson contends that the trial court improperly excluded proper impeachment evidence, specifically his testimony about a prior inconsistent statement made by T.R.

{¶ 36} On cross-examination, T.R. testified that she never had a cousin teach her about sex, never had a cousin make her watch her have sex, and never told Gibson this:

Q: Okay. You also were asked the question about you didn't—well, you were told—you were asked if did you know a lot about sex, and then

you said no, and then you were asked did Mr. Gibson teach you about sex, and you answered yes. Is that what you said?

A: Yes.

Q: So when this stuff is happening to you, you'd never had any sexual experience at this point?

A: Never.

Q: Okay. You'd never had a cousin teach you.

A: Never.

Q: You'd never had a cousin make you watch her have sex with a boy?

A: No.

Q: Did you ever make those statements to Mr. Gibson?

A: No.

Q: You never made statements—

A: No.

Q: —to him that your cousin—that your cousin had made you do that.

A: I never—no.

(Vol. I Tr. 97.)

{¶ 37} Later, defense counsel asked Gibson on direct examination, "Did [T.R.] ever tell you that her cousin taught her about sex?" (Vol. II Tr. 289.) The State objected to the question as calling for hearsay. At a sidebar, defense counsel explained that the question was intended to elicit evidence of T.R.'s prior inconsistent statement, "[b]ecause I asked her directly if she made this statement to him and she denied it." (*Id.* at 290.) The State

also mentioned the rape-shield statute. The trial court agreed that the questioning called for hearsay as well as testimony that violated the rape-shield statute.

{¶ 38} As an initial matter, Gibson argues that the trial court incorrectly concluded that the testimony was inadmissible under the rape-shield statute. The State agrees, and so do we. The testimony did not concern T.R.'s past sexual activity but only that she had told Gibson that she was aware of what sex was because she had observed her cousin engaging in sexual activity.

{¶ 39} As for impeachment, Gibson could attack T.R.'s credibility by showing that she had contradicted herself. *See* Evid.R. 607(A). He could present extrinsic evidence of her prior inconsistent statement if two things were true:

> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following:
>
>> (a) A fact that is of consequence to the determination of the action other than the credibility of a witness[.]

Evid.R. 613(B). *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 125 (the rule "specifically contemplates the admission of extrinsic evidence of a prior statement under the circumstances outlined in Evid.R. 613(B)").

{¶ 40} It appears that the trial court determined that the excluded testimony was not being offered solely for the purpose of impeaching T.R., making it inadmissible

hearsay. Be that as it may, we agree with the State that Gibson's testimony was properly excluded because it regarded a collateral matter. The subject matter of T.R.'s alleged statement that her cousin taught her about sex concerns how, or from whom, T.R. learned about sex, whether from her cousin or from Gibson. But this was not a fact of consequence to the determination of whether Gibson raped T.R., because the fact did not make whether he did so more or less likely. We see no abuse of discretion here. *See State v. Shaffer*, 114 Ohio App.3d 97, 102, 682 N.E.2d 1040 (3d Dist.1996) ("[t]he decision whether to admit a prior inconsistent statement which is collateral to the issue being tried and pertinent to the credibility of a witness is a matter within the sound discretion of the trial judge").

{¶ 41} Gibson argues that he was prejudiced by the court's ruling because the credibility of the key witness was at issue. But even assuming that the trial court should have allowed Gibson's testimony on this matter, and that Gibson would have answered that T.R. did make the statement to him, we are confident that it would not have changed the jury's verdict. Moreover, there were other inconsistencies in T.R.'s testimony that potentially affected her credibility, which we discussed in our review of the manifest weight of the evidence. We conclude that evidence of this particular inconsistency would not have led the jury to find Gibson not guilty.

{¶ 42} The second assignment of error is overruled.

### C. The sentence

{¶ 43} The third and fourth assignments of error allege, respectively:

The Record does not Support the Trial Court's Excess Sentence.

The Record does not Support Consecutive Sentences.

{¶ 44} R.C. 2953.08(G)(2) gives the standard for reviewing felony sentences:

The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * *;

(b) That the sentence is otherwise contrary to law.

" 'This is an extremely deferential standard of review.' " *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 31 (2d Dist.), quoting *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.). The clear-and-convincing standard in the statute " 'does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings.' " *Id.* at ¶ 31, quoting *Venes* at ¶ 21.

{¶ 45} "[A] sentence is not contrary to law when the trial court imposes a sentence within the statutory range, after expressly stating that it had considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors in R.C. 2929.12." *Id.* at ¶ 32, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18. "[N]either R.C. 2929.11 nor 2929.12 requires a trial court to make any specific factual findings on the record." *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 19, citing *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31; *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). "R.C. 2953.08(G)(2)(b) * * * does not provide a basis for an appellate court to modify or vacate

a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *Id.* at ¶ 39.

{¶ 46} Gibson's sentence for each offense was within the statutory range and so each was authorized by law. *See* R.C. 2929.14(A)(1). Moreover, the trial court expressly stated that it had considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors in R.C. 2929.12. Collectively, this was enough to establish that none of Gibson's individual sentences was contrary to law.

{¶ 47} The law presumes that multiple sentences will be served concurrently. *See* R.C. 2929.41(A). But R.C. 2929.14(C)(4) contains an exception that allows a trial court to require consecutive service:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

* * *

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part

of any of the courses of conduct adequately reflects the seriousness

of the offender's conduct.

"In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶ 48} "[W]here a trial court properly makes the findings mandated by R.C. 2929.14(C)(4), an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Withrow*, 2016-Ohio-2884, 64 N.E.3d 553, ¶ 38 (2d Dist.). In other words, "the consecutive nature of the trial court's sentencing should stand unless the record overwhelmingly supports a contrary result." *Id.* at ¶ 39, citing *State v. Kay*, 2d Dist. Montgomery No. 26344, 2015-Ohio-4403, ¶ 26 (Hall, J., dissenting).

{¶ 49} Here, the trial court found that consecutive sentences were necessary in this case. The court found that they were necessary to protect the public from future crimes and to punish Gibson. The court further found that consecutive sentences were not disproportionate to the seriousness of his conduct or the danger that he posed to the public. Gibson committed at least two of the offenses as part of one or more courses of conduct, and the harm caused by the offenses was so great or unusual that no single prison term could adequately reflect the seriousness of his conduct.

{¶ 50} Gibson concedes that the trial court made the required statutory findings, and we agree that there was no error in this regard. Rather, he says that the court failed

to specify its reasons for the findings and contends that the evidence did not support consecutive sentences. Gibson argues that a sentence of 160 years was excessive, not proportionate to the crimes committed, and reflected a failure to consider any possibility of rehabilitation. He points out that he had no criminal history, that he had not committed any criminal offenses during his 40 years of his life, maintained employment, a home, and a marriage.

{¶ 51} We agree that the sentence was extremely harsh. It is not the sentence that the judges on this panel would have imposed if initial sentencing were our responsibility. But what we might have done in the trial court's place is not the standard of review. " 'R.C. 2953.08(G)(2) makes it clear that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." As a practical consideration, *this means that appellate courts are prohibited from substituting their judgment for that of the trial judge.*' " (Emphasis sic.) *State v. Overholser*, 2d Dist. Clark No. 2014-CA-42, 2015-Ohio-1980, ¶ 38 (Welbaum, J., dissenting), quoting *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, at ¶ 20. Indeed, "we must affirm the decision of the trial court even though we might be persuaded that the trial court's decision in this regard 'constitutes an absence of the exercise of discretion.' " *State v. Withrow*, 2016-Ohio-2884, 64 N.E.3d 553, at ¶ 37, quoting *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 35 (Hall, J., dissenting).

{¶ 52} The trial court was not required to state reasons to support its consecutive-sentence findings. In order to reverse the imposition of consecutive sentences, we must clearly and convincingly find that the record did not support the court's findings. The record in this case makes the trial court's finding that "consecutive sentences are not

disproportionate * * * to the danger the offender poses to the public" debatable, but not clearly wrong. That Gibson had no criminal history and by all accounts led a law-abiding life before the events in this case makes what amounts to a life sentence troubling. But this must be weighed against the gravity of what he did—repeatedly—to T.R. On the whole, we cannot say that the record in this case overwhelmingly shows that the trial court's consecutive-sentence findings were wrong.

{¶ 53} The third and fourth assignments of error are overruled.

### III. Conclusion

{¶ 54} We have overruled each of the assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . .


TUCKER, P.J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Johnna M. Shia
Hon. Mary E. Montgomery